**WESTINGHOUSE BROADCASTING COMPANY, Inc., Petitioner,**

**v.**

**COMMISSIONER OF INTERNAL REVENUE.**

No. 13839.

United States Court of Appeals Third Circuit.

Argued May 17, 1962.

Decided Oct. 19, 1962.

Albert R. Connelly, New York City (Cravath, Swaine & Moore, George G. Tyler, New York City, Leonard E. Kust, Pittsburgh, Pa., George S. Parlin, Jr., New York City, on the brief), for petitioner.

Burt J. Abrams, Washington, D. C. (Louis F. Oberdorfer, Asst. Atty. Gen., Lee A. Jackson, Harry Baum, Attys., Dept. of Justice, Washington, D. C., on the brief), for respondent.

Before KALODNER, HASTIE and SMITH, Circuit Judges.

KALODNER, Circuit Judge.

Is a television network affiliation contract for a two-year term, automatically renewable in the absence of termination notice for successive two-year terms, a depreciable asset?

That is the question presented by this petition for review of the Decision of the Tax Court which answered it in the negative [1] premised on its determination that the contract had "an indeterminate useful life" as of the close of the tax years here involved.

The facts critical to our disposition may be summarized as follows:

On June 1, 1953, Westinghouse Broadcasting Company, Inc. ("taxpayer") purchased from Philco Corporation ("Philco") for $8,534,000 all of the assets of television station WPTZ in Philadelphia, Pennsylvania, including its network affiliation contract with National Broadcasting Company (NBC) which was to expire on January 1, 1954. [2]

The network affiliation contract was renewable automatically for successive two-year terms unless, at least 90 days prior to the expiration of any two-year term, either party sent the other written notice of its intention not to renew. [3]

---

1. 36 T.C. 912 (1961).

2. The network affiliation contract set forth the terms of WPTZ's affiliation with NBC. By the terms of the affiliation contract, NBC agreed to supply to WPTZ a variety of network television programs, sponsored or unsponsored and to give WPTZ the right of first refusal to broadcast such programs in the Philadelphia area. WPTZ agreed, with certain exceptions, to broadcast sponsored programs of the NBC network during hours designated in the contract as "network option time". The financial arrangement set forth in the contract called for a division between WPTZ and NBC of gross billings to network advertisers for WPTZ's station time, WPTZ receiving a one-third share and NBC receiving a two-thirds share, except that for the first 24 hours of network programs broadcast by WPTZ each month billings were to be paid entirely to NBC. Billing rates were specified in the contract and were subject to change by NBC under conditions therein specified.

3. The renewal provision reads as follows:
"23. This agreement * * * shall remain in effect for a period of two years. It shall then be renewed on the same terms and conditions for a further period of two years, and so on for successive further periods of two years each unless and until either party shall, at least three months prior to the expiration of the then current term, give the other party written notice that it does not desire to have the contract renewed for a further period."

The agreement between Philco and taxpayer allocated $5,000,000 of the $8,500,000 purchase price of WPTZ to the network affiliation contract, $1,500,000 to good will and the balance to tangible assets and receivables.

The network affiliation contract was automatically renewed on January 1, 1954 for a two-year term expiring January 1, 1956. On September 28, 1954 NBC informed taxpayer that it desired to acquire a television station in Philadelphia and sometime prior to November 15, 1954 taxpayer was further advised by NBC that it would not renew the network affiliation contract beyond January 1, 1956.[4] On October 1, 1955 pursuant to the 90-day notice provision of the affiliation contract NBC gave formal notice to taxpayer of termination of the network affiliation contract on January 1, 1956.

The network affiliation contract had been entered into between NBC and Philco Television Broadcasting Corporation on November 23, 1949 for a two-year term commencing January 1, 1950 and automatically renewed on January 1, 1952 for a further two-year term expiring January 1, 1954. It had been assigned to Philco by Philco Television Broadcasting Corporation on May 14, 1952 during the renewed term.

Federal Communications Commission (FCC) regulations in effect during 1953 and 1954 prohibited any contract providing for network affiliation for a term longer than two years.[5]

The average earnings *before taxes* of WPTZ for 1951 and 1952 were $1,704,459. The net broadcast income of WPTZ for 1951 and 1952 exceeded the broadcast income of WFIL-TV, the ABC affiliate in Philadelphia, by $748,000 and $1,250,000 respectively, and such excess was attributed by taxpayer's expert, Howard E. Stark, to WPTZ's affiliation with NBC.

Between January 1, 1953, and April 1, 1960, a total of 87 NBC affiliation agreements expired in circumstances other than a station going off the air or the acquisition of the affiliate by the network.

Taxpayer, on its books, and federal income tax returns for 1953 and 1954, depreciated its cost of the $5,000,000 network affiliation contract over a 55-month period ending January 1, 1958, i. e., the 7-month term in existence on June 1, 1953, plus two renewal terms of two years each (January 1, 1954 to January 1, 1956 and January 1, 1956 to January 1, 1958) based on taxpayer's assumption that network affiliation contracts may normally be expected to be renewed for two terms. Subsequently, in the course of the proceedings below, taxpayer contended that the network affiliation contract was depreciable over a 31-month period—the 7-month term ending January 1, 1954 and the 24-month period ending January 1, 1956 when the contract was actually terminated.

Taxpayer here contends that the Tax Court erred in its finding that the network affiliation contract did not have a "determinable useful life" as of the close of 1953 and 1954, the tax years under review. It urges that "as a matter of law, a business contract with a specific term and provision for renewal is definitely limited in duration to that term and such renewal terms as are reasonably certain to occur", and, that "as a matter of fact, there was no reasonable certainty of renewal indefinitely with respect to the affiliation agreement" and that "the maximum period of renewal was to January 1, 1958."

The record, taken as a whole, says taxpayer, "establishes that at the time of acquisition of the affiliation agreement on June 1, 1953, two renewals, i. e. renewals to January 1, 1958, might be reasonably certain, but that a renewal be-

4. On May 16, 1955 taxpayer entered into an agreement with NBC whereby it agreed to exchange the assets of WPTZ and its Philadelphia radio station for the assets of NBC's Cleveland, Ohio television and radio station plus $3,000,000. The actual exchange of stations took place on January 21, 1956.

5. 47 CFR (Revised 1953) Sec. 3.658(c).

yond January 1, 1959 was not reasonably certain", and that "Thus the contract, under the reasonable certainty rule, had a maximum useful life of 55 months at the end of 1953 and 1954." In support, taxpayer cites the testimony of its expert, Stark: "If you could not assume two renewals, I don't think I would advise anyone to enter into a contract, but beyond that you can't foresee anything in this business."[6]

The sum of the Commissioner's position is that Section 23(l) of the Internal Revenue Code of 1939 (applicable here to the year 1953) and Section 167(a) of the Internal Revenue Code of 1954 (applicable here to 1954) provide for a depreciation deduction in circumstances where such deduction represents "a reasonable allowance for the exhaustion * * * of property used in the trade or business"; that Treasury Regulations 118 (1939) Code, Sec. 39.23(1)–3 and Treasury Regulations on Income Tax (1954 Code), Section 1.167(a)–3, provide that if an intangible asset is known from experience to be of use in the business or in the production of income for only a limited period, the length of which can be estimated with "reasonable" certainty, such intangible asset may be the subject of a depreciation allowance; that both the 1939 and 1954 Treasury Regulations impose upon the taxpayer the burden of establishing the reasonableness of the deduction for depreciation allowance;[7] and finally, that the record discloses that taxpayer had failed to establish with "reasonable" certainty that the maximum period of renewal of the network affiliation contract was to January 1, 1958.

The Tax Court held that "Insufficient evidence was introduced from which could be calculated either the average useful life of network affiliation contracts or their useful life span", and further

stated its conclusion "that petitioner [taxpayer] has not only failed to persuade us that the contract had a 55-month useful life but also that it has failed to persuade us respondent [Commissioner] erred in his determination that the contract had an indeterminable useful life".

On review of the record we agree with the Tax Court's holding that taxpayer failed to prove that at the close of the taxable years 1953 and 1954 it was "reasonably certain" that the network affiliation contract had a maximum useful life of but 55 months from the date of its acquisition by taxpayer on June 1, 1953.

The burden of proof to do so was on taxpayer not only under the applicable revenue statutes and the Treasury Regulations pertaining to them, earlier cited, but by reason of the well-settled principle that the Commissioner's determination of a deficiency in tax bears a presumption of correctness. Hoffman v. Commissioner, 298 F.2d 784, 788 (3 Cir. 1962).

Taxpayer did not adduce any testimony to the effect that based on "experience" in the television industry the number of renewals of the network affiliation contract could be "estimated" with "reasonable certainty" or "reasonable accuracy" as required by the Treasury Regulations earlier cited.

While taxpayer's expert, Stark, in substantiating the $5,000,000 consideration paid for the network affiliation contract, testified that he had assumed a useful life for the contract which contemplated two renewals after acquisition, or 55 months in this case, he did not say that his assumed premise of such two renewals was based on "experience" with such contracts. All that Stark said was that it was the "practice" of experts in evaluating network affiliation contracts "to an-

6. Stark, a broker specializing in the purchase and sale of radio and television stations, played no part in the transaction in which taxpayer acquired station WPTZ from Philco.

7. Treas.Reg. 118, Sec. 39.23(l)–5 (1939); Treas.Reg. on Income Tax Sec. 1.167 (b)–0 (1954 Code).

ticipate the likelihood of two separate renewals * * * following the expiration of the unexpired term of the contract", to which he added that in his post-evaluation of the contract here involved he had in mind that anticipation and "the hope that it would be continued beyond that date [two separate renewals]".

It must be stressed that nowhere in his testimony did Stark say that the "practice" of experts in anticipating two renewals of network affiliation contracts was based on "experience" with respect to contract renewals.

Under the circumstances we agree with the Tax Court that the "practice" of the experts in figuring on two renewals of a network affiliation contract was not "a sufficient indication of that contract's probable useful life."

Nor can any probative value with respect to the "probable useful life" of the network affiliation contract here be attributed to the stipulated fact that "between January 1, 1953 and April 1, 1960, a total of 87 NBC affiliation agreements expired in circumstances other than a station going off the air or the acquisition of the affiliate by the network" since there was no evidence as to the actual life span of those agreements or as to the number of their renewals.

This too must be said. Taxpayer based its 55-month useful life estimate of the network affiliation contract on its premise that there was reasonable certainty of only 48 months plus the 7 months of its unexpired term. The premise was in turn sub-based, so to say, on the theory that network affiliation contracts have a life span of 72 months, their original two-year term and two renewals. Taxpayer disregards the fact that the network affiliation contract here had actually run for 24 months (January 1, 1950 to January 1, 1952) prior to the renewed term (January 1, 1952 to January 1, 1954) during which it was acquired by taxpayer on June 1, 1953.

It would serve no useful purpose to discuss the cases cited by taxpayer and the Commissioner since the facts in those cases vary significantly from those existing here.

For the reasons stated the decision of the Tax Court will be affirmed.