**MEREDITH BROADCASTING COMPANY**
v.
The **UNITED STATES.**
No. 30–59.

United States Court of Claims.
Dec. 13, 1968.
As Amended Jan. 31, 1969.

Warren C. Seieroe, Chicago, Ill., attorney of record, for plaintiff, James M. Roche, McDermott, Will & Emery, Chicago, Ill., of counsel.

Joseph Kovner, Washington, D. C., with whom was Asst. Atty. Gen. Mitchell Rogovin, for defendant, Philip R. Miller and Leonard S. Togman, Washington, D. C., of counsel.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON and NICHOLS, Judges.

## OPINION

NICHOLS, Judge.*

This is a suit to recover federal income taxes and assessed interest paid for the fiscal year ended June 30, 1953, plus statutory interest. The suit arises primarily as a result of defendant's disallowance of a claimed deduction for amortization of certain television network affiliation contracts that were acquired by plaintiff in 1952 when it and its wholly owned subsidiary, Meredith Syracuse Television Corporation (hereafter referred to as Meredith Television), acquired all the operating assets of radio and television stations KPHO and KPHO–TV in Phoenix, Arizona.

The parties have agreed that the aggregate federal tax basis of such assets when received by plaintiff and Meredith Television was $1,504,239, of which $489,668 was the basis of the land and buildings received by Meredith Television and $1,014,571 was the basis of all the remaining assets which were received by plaintiff. With respect to plaintiff's $1,014,571, it has been agreed that $514,571 thereof is properly allocable to tangible assets and that $40,-294 is properly allocable to a so-called tower lease.

The parties have further agreed that the remaining amount of $459,706 is plaintiff's total cost basis for all intangible assets (other than the tower lease), and it is only this amount which is involved in the present controversy. Ordinarily plaintiff would be required to prove that it had a cost basis for such contracts and that a part of such cost basis was deductible in that year. Prior to trial, however, the parties after thorough consideration entered into an agreement, embodied in a pretrial memorandum, that the only question in controversy was plaintiff's cost basis for the network contracts and that plaintiff will be allowed a deduction for its fiscal year ended June 30, 1953, for whatever portion of such $459,706 the court determines is properly allocable as the cost basis of the television network affiliation contracts acquired by plaintiff as

* This opinion incorporates, with modification and addition, the report of the then commissioner, now judge, Herbert N. Maletz, prepared for the court under the order of reference and Rule 57(a), and we wish to acknowledge his great assistance.

part of the operating assets of KPHO–T.V.

The primary question is thus whether any part of the purchase price of $459,706 for the intangible assets (other than the tower lease) is properly allocable as the cost basis of the television network contracts, and, if so, specifically what portion. In addition, if any part of the $459,706 is determined to be allocable to intangible assets other than the network contracts, there are subsidiary questions of whether such amounts are amortizable.

In order to understand fully the facts and issues here involved, it is necessary to consider first by way of background the basic elements of television broadcasting.

At the outset, it is to be noted that the nature of the broadcasting spectrum requires exclusive use of a given frequency in the area in which the signal is received to prevent electrical interference between stations. For this reason, television broadcast stations operate on channels assigned by the Federal Communications Commission (FCC). There are 12 very high frequency or "VHF" channels, numbered 2 to 13, and 70 ultra high frequency or "UHF" channels, numbered 14 to 83. Varying numbers of channels are allocated to particular cities by the FCC on the basis of population and other factors, and each allocated channel may be assigned to a particular applicant by the granting of a construction permit, and then a license. Until 1955, the license was generally for a one-year term though in practice it was renewed by the FCC unless it was operated contrary to the public interest. Since 1955 the usual license term has been three years.

Commercial operation of television stations was first approved in 1941 when the FCC authorized 18 VHF channels, and by 1945, six commercial stations were in operation. In late 1945, the FCC adopted a table of assignments allocating VHF television channels throughout the United States. On September 30, 1948, the FCC stopped processing applications for new television station construction permits and did not resume processing such applications until July 1, 1952, at which date there were 108 VHF television stations in operation. This period is referred to in the industry as "the freeze."

After the freeze was ended, many applications were filed with the FCC to obtain licenses for the available channels. If more than one applicant filed for the same television assignment, the FCC was required by law to hold a formal comparative hearing to select the applicant best qualified. Since such hearings were expensive and time-consuming, various methods were used to avoid them and obtain a license, such as merger of competing applicants and purchase by one applicant of the interests of another. A license, although not saleable as such, could also be acquired by transfer upon the purchase of an operating station. While FCC approval of the license transfer was required, such approval was not subject to a comparative hearing. This meant, as a practical matter, that if the transferee were otherwise qualified, he could count on favorable agency action.

Commercial television in the United States is supported by advertisers who purchase time and other services of television stations so that commercial messages may be presented to the television audience. As an advertising medium, its value is measured, like that of other media, by the size of the audience. The television audience is attracted primarily by the programs and not by the particular broadcast station, call letters, station personnel or management. The total audience of a given station thus depends upon the quality of the programs presented, the number of sets which can receive the station's signal, the quality of program continuity achieved by the station and its competitors, and the promotional activities in which the station and its competitors engage.

There are three broad classes of advertising, known in the industry as network, national spot and local. (The term "spot" refers to placing advertising with selected individual stations.) An advertiser may obtain nationwide advertising coverage either by purchasing station time through a national network or by dealing with selected stations individually through station representatives. National and regional advertisers may also select stations in specific areas in which coverage is desired. Local advertisers are those who do not use networks but purchase program time or adjacencies from local stations. The advertising itself has taken various forms. An advertiser may present a program, together with a commercial message, on time purchased from the station. Several advertisers may purchase "participating" announcements, which are interspersed throughout an individual program. An advertiser may purchase an adjacency or announcement (generally of 8, 20 or 60 seconds duration) for presentation in the interval between programs—with the size of the audience which can be expected to see the announcement being determined by the audience for the programs which precede and/or follow the announcement.

There are three national television networks, Columbia Broadcasting System, Inc. (CBS); National Broadcasting Company, Inc. (NBC); and American Broadcasting Company, Inc. (ABC). A fourth network, Allen B. DuMont Laboratories, Inc. (DuMont), ceased operations in September 1955.

Television programming has, from the outset, been very expensive to produce. Because of high costs, television can be an economical and effective advertising medium only if it attracts large viewing audiences so that the cost per thousand viewers (cost per thousand) is minimized. Large viewing audiences, in turn, depend upon attractive programming, and in the late 1940's and early 1950's, the major sources of high level competitive programming for local sta-

tions were television networks and advertisers using television networks. Other programming sources consisted of old movies, public service shows, syndicated independent films, reruns of network programs and local live originations. The reason for network preeminence in programming stems from the fact that a network is able to spend vastly more for programs than individual stations simply because it can spread its costs over a much wider base. Thus, a network and the advertiser can incur high costs for a single program and yet have a low cost per thousand because the program is broadcast over a network of more than 50 stations. In these circumstances, not only is it feasible for the networks to produce the expensive live shows which are beyond the reach of single stations; the networks, in addition, are able to and do purchase the most attractive and expensive syndicated film programs and feature films. For an independent station to command the same audience as a competing network station, its programs would have to be of the same quality or attractiveness to the local audience as the network program being offered by a competing station at the same time. The attractiveness of a program to a local viewing audience does not, of course, depend solely upon the cost of the program. A local football game, for example, which could be televised at low cost might be watched by more people than an expensive entertainment program.

Traditionally, network programs have been most significant during the prime evening hours from 7:30 P.M. to 10:30 P.M. when potential audiences are greatest, advertisers' interest the keenest, and time rates the highest. The independent station, broadcasting the type of programs that are available within the limits of its budget, cannot as a rule successfully compete for the viewing audience against network programs in that time period. As a result, prime time audience and advertising have been dominated by network affiliated stations

with independents being only an insubstantial factor.

The advertising revenues of a network affiliated station are divided into the primary category of network revenues and non-network revenues with the station having a schedule of time rates for network programs and separate schedules of non-network time rates for national spot and local programs, which rates are always higher than the station's network rates. In the case of network revenues, the network in the first instance is paid by the advertiser (invariably a national advertiser) for the exposure of the program and commercial message over a line-up of individual stations affiliated with the network. The total paid by the advertiser is based upon the aggregate of the network time rate of each individual station in the line-up, plus the cost of the program if it is furnished by the network. The network, in turn, pays to the individual station for broadcasting the program and commercial message a specified percentage—usually around 30 percent—of the station's network time rate paid by the advertiser. Thus an advertiser purchasing time on a network in effect purchases the facilities of each individually ordered station at the network rate of the station for the time in question. A significant aspect, in addition, is that the station retains short time periods called adjacencies around network programs which it may sell to other advertisers directly. Because of the large audiences attracted by popular network programs, such adjacencies are easily sold at rates that are higher than the station's network time rate.

A station grosses more from broadcasting its own locally produced or purchased program than it does from broadcasting a network program. However, the station incurs various expenses of production, selling, etc. with regard to non-network programs which have no counterpart with regard to network programs. Moreover, the relative quality of the non-network program as compared to the network program affects the saleability of adjacencies which, in turn, affects the station's gross. The result is that a station's profit from non-network programs is generally less than that realized from network programs.

In addition to network revenue, two things distinguish the independent station from its affiliated counterpart, namely, value of product and cost of product. The product, of course, is the audience and, to a major extent, the prime evening hour audience. The value of the product (as seen before) is directly related to the attractiveness of the programs the station is able to broadcast. As described above, whereas the network affiliate during prime hours offers the most expensive live and film network programs, the independent must rely on syndicated independent films, reruns of network programs, feature films within its budget, and live programs. With such programs, the independent, as a general rule, can capture in the prime evening hours only a small share of the potential audience in the market—which means that its time during such period is not readily saleable and hence, its revenue from sale of product is low in comparison to a network affiliate in the same market. Moreover, during the important prime evening hours, the cost of product in the case of a network affiliate is insubstantial since the network rather than the station bears the cost of purchasing or producing most prime evening-hour shows and in order to broadcast them, the station has but to "flip the switch." In the case of an independent, on the other hand, the station itself must at its own expense purchase or produce the audience-getting program. The third distinguishing factor is, of course, the share of network revenue paid to the affiliate by the network, which payment has no counterpart in the case of an independent.

These factors in concert have resulted in higher revenues, lower costs, and higher operating profits for affiliated

stations as compared to independent stations. Stations with network affiliation usually operated at substantial profits during this same period. In such circumstances, during the 1950's, and particularly 1952 and 1953, in most markets affiliated television stations were considerably more valuable than independent (non-affiliated) stations as going businesses, and as between the respective networks, an NBC affiliation might have been slightly more valuable than a CBS affiliation, and either an NBC or a CBS affiliation was substantially more valuable than one with ABC. A DuMont affiliation was of very minor value, becoming meaningless by 1955.

Considering now in greater detail the contractual arrangements between the networks and stations, in any market where the number of stations is the same as or greater than the number of networks, each of the networks enters into an exclusive affiliation contract with one station in that market, and that station, in turn, affiliates only with that network. This is the standard affiliation contract for which the stations do not have to pay the networks. During the period relevant here, the standard affiliation contract was for a two-year term because the FCC Chain Broadcasting rules prohibit a longer term, but NBC and CBS contracts were automatically renewable if not terminated by either party. The contract provided (among other things) that: (1) the network agreed, at its expense, to provide programming to the station; (2) the network promised the station to offer it first call for all programs broadcast in that community; (3) the station agreed to a so-called option-time arrangement whereby the station promised (with certain exceptions) to broadcast during nine specified hours of the broadcast day (which included the prime evening hours from 7:30 P.M. to 10:30 P.M.) all sponsored programs offered by the network; and (4) the network agreed to pay the station for broadcasting the network programs a specified percentage (usually about 30 per-

cent) of the station's network time rate paid by the advertiser. In the market situations prevailing prior to July 1, 1952, where there were more networks than stations, a station and a network in some cases entered into a secondary affiliation agreement which provided that the station would broadcast the network program at a specified rate at such time as the station could arrange. A network could have secondary affiliation agreements with several or all the stations in a given market. Under this type of arrangement, the network was not given option time by the station.

The period between 1952 and 1956 was a highly dynamic one in the development of television and was marked by unusual expansion in television facilities. While there were numerous affiliation changes during this period, in a substantial majority of cases networks and stations continued their contractual arrangements from term to term. In selecting television affiliates, the networks considered a number of factors including the station's management, personnel and reputation in the community; the existence of a satisfactory relationship between the station's owners and operators; and the broadcaster's experience and history in the broadcasting field. The networks in making an initial affiliation decision followed the general practice of granting the television affiliation to their radio affiliate when the latter succeeded in obtaining a competitive television facility in the same market. In this connection, the networks frequently held open their permanent television affiliation in the market while their radio affiliate was seeking a television license from the FCC. As an interim measure, a network might affiliate with an existing station in the market with the specific understanding that if the network's radio affiliate obtained a television license, the affiliation would be transferred to it.

In actual practice, network affiliations have been freely transferable in connection with sales or transfers of station properties, and there does not

appear to have been any instance where a network refused to make the transfer upon the sale of a station.

We come now to the facts of the present case. Plaintiff is engaged principally in television and radio broadcasting and related activities. It is a wholly owned subsidiary of Meredith Publishing Company, a corporation principally engaged in the publishing of magazines (BETTER HOMES AND GARDENS and SUCCESSFUL FARMING) and books. In 1948, the Meredith organization made a decision to enter the television broadcasting business which it viewed as a different facet of the broad field in which it was already engaged, i. e., advertising through mass communications media. Pursuant to this decision, plaintiff in the period prior to the freeze of September 30, 1948, filed applications for new construction facilities in a number of cities, but only one—its application for Syracuse, New York—was acted upon by the FCC before the freeze went into effect. A construction permit for Syracuse was granted in July 1948 and in December 1948 the Meredith station, WHEN–TV (operated by Meredith Television), commenced broadcasting as the first television station in that city, with affiliation arrangements with all four networks until 1949 when a second station went on the air and became affiliated with NBC. In 1951, plaintiff acquired radio and television stations WOW in Omaha, Nebraska, which had been operating at a loss, for $2,525,000. WOW–TV then had a primary network affiliation contract and secondary affiliation arrangements with ABC and DuMont, with the other station in that market having a primary affiliation arrangement with CBS. WOW–TV was consistently profitable after its acquisition. In 1953, plaintiff purchased radio and television stations KCMO in Kansas City, Missouri, which also had been operating at a loss, for $2,450,000. All the foregoing markets were allocated three stations or less so that in each such market the Meredith station was assured of

having at least one network affiliation. Indeed, in acquiring television stations, plaintiff sought and was interested only in those having network affiliations— which was attributable to its considered judgment that it was not possible for an independent station to operate on a profitable basis except in such large cities as New York, Chicago or Los Angeles. It is also worthy of note that as a result of its entrance into television and radio broadcasting, together with the fact that its parent company, Meredith Publishing, was engaged in mass media advertising through its magazine publishing business, plaintiff had reason to believe that it enjoyed good business relations with the television networks, and particularly with NBC and CBS.

After its acquisition of the WOW stations in Omaha, plaintiff, in early 1952, became interested in the possibility of acquiring television station KPHO–TV in Phoenix, Arizona. Top management of the Meredith organization was personally familiar with the Phoenix area, acquainted with the station's ownership, and very favorably impressed by the area's growth rate. The area's television broadcasting situation was then as follows: on November 28, 1945, the FCC had allocated VHF channels 2, 4, 5 and 7 to Phoenix-Mesa which was changed on April 11, 1952, by allocation of VHF channels 3, 5, 8 (educational), 10 and 12. KPHO–TV had commenced television broadcasting on channel 5 in December 1949 under a construction permit issued by the FCC, and was later issued a broadcasting license. Until April 20, 1953, it was the only television station licensed and broadcasting in the Phoenix-Mesa area and as a consequence had affiliation contracts with all four television networks. The station was owned and operated by Phoenix Television, Inc. (Phoenix Television) whose outstanding stock was owned by the same individuals who owned the outstanding stock of Phoenix Broadcasting, Inc. (Phoenix Broadcasting) which

owned and operated radio station KPHO
–AM in Phoenix.

Negotiations looking to the acquisition by plaintiff of Phoenix Broadcasting and Phoenix Television took place in March and April 1952, and on April 29, 1952, plaintiff and its wholly owned subsidiary, Meredith Television, contracted with the stockholders of Phoenix Broadcasting and Phoenix Television to purchase all the stock of the two corporations for a total price of some $1,-500,000. Following approval by the FCC, the purchase of Phoenix Broadcasting and Phoenix Television stock was consummated on July 11, 1952, and after further FCC approvals, plaintiff and Meredith Television caused the assets of Phoenix Broadcasting and Phoenix Television to be distributed in liquidation in exchange for all outstanding stock. The initial liquidation distribution comprising substantially all assets was made on August 18, 1952, with respect to Phoenix Broadcasting and on August 19, 1952, with respect to Phoenix Television. Final liquidating distributions were completed and both Phoenix Broadcasting and Phoenix Television were dissolved on December 31, 1952.

As previously indicated, the parties have agreed that plaintiff's total cost basis for all intangible assets (other than the tower lease) was $459,706; that only this amount is involved in the present controversy; and that the primary question is what part, if any, of this sum is properly allocable as the cost basis of the network affiliation contracts. The parties have further agreed that the intangible assets comprising this amount of $459,706 are as follows: television network affiliation contracts; broadcast licenses issued by the FCC for KPHO radio and television; radio and television advertising contracts; and goodwill, if any, of Phoenix Broadcasting and Phoenix Television and/or radio and television stations KPHO, as the case may be. In light of this agreement, we next examine each of the intangible assets acquired by plaintiff, beginning with the television network affiliation

contracts which Phoenix Television had previously entered into with ABC, DuMont, NBC and CBS.

On August 12, 1952, as part of the initial distribution in complete liquidation, Phoenix Television assigned to plaintiff all its rights, title and interest in the four network contracts, and by agreement with each of the four networks, plaintiff acquired the rights and assumed the obligations of Phoenix Television under each. The acquisition of such network affiliation contracts was of critical importance to plaintiff in the acquisition of KPHO–TV. In fact, plaintiff's witnesses stated that had it not been confident of its ability to retain at least one network affiliation contract over successive two-year periods for an indefinite time in the future, it would not have purchased the station, since it was of the opinion, based upon its industry knowledge and experience, that it could not operate profitably without a network affiliation. As of August 19, 1952, the affiliation contracts had unexpired terms as follows: ABC to November 27, 1953; DuMont to November 27, 1952; NBC to January 1, 1954; and CBS to November 27, 1953. Such temporary affiliations could have been acquired from the networks if the vendor had not already had them, however.

At the time plaintiff acquired KPHO–TV, it knew that the freeze would end shortly; that four commercial stations were allocated to the Phoenix area; that other stations would come on the air in a matter of months; and that there were several applicants for the remaining stations, one of whom had close ties with NBC while another not only had close ties with CBS, but also owned the CBS radio affiliate in Phoenix as well. Plaintiff was of the opinion that if the applicant having close ties with NBC was successful in obtaining a television license, he would probably get the NBC affiliation. It expected, however, that it would retain the CBS affiliation in Phoenix even in the event the owner of the CBS radio affiliate (or anyone else) obtained a television license—which expectation

was based on the following considerations: (a) plaintiff's television station in Syracuse was already a CBS affiliate and plaintiff was thus developing rather close day-to-day contacts as a broadcaster with CBS; (b) among the factors which the networks considered in selecting a television affiliate was the broadcaster's experience and history in the broadcasting field; and (c) CBS gave plaintiff no indication that it might transfer affiliation to the owner of its radio affiliate in Phoenix in the event he obtain a television license. On April 29, 1953, CBS entered into a standard two-year affiliation agreement with KPHO–TV starting June 15, 1953. The situation in short is that plaintiff purchased KPHO–TV recognizing that it would lose some of its television network affiliation contracts as more stations entered the market, but expecting that either NBC or more likely CBS would be retained on a rather permanent basis and with confidence that, at worst, ABC would be retained. Indeed, in negotiating the $1,500,000 purchase price for the assets of KPHO–TV and KPHO–AM, plaintiff's witnesses testified it gave primary consideration to reasonably anticipated revenues, operating expenses, and operating profits, all of which assumed the continuation of a CBS or NBC television affiliation.

The fact that KPHO–TV was the only television station in operation in the Phoenix-Mesa area at the time of the acquisition was of significance or value to plaintiff in that plaintiff as a result succeeded to valuable business relationships with each of the television networks and thereby improved its chances of retaining at least one of its network affiliations. Other than that, plaintiff placed no significance upon KPHO–TV's monopoly position in Phoenix at the time of acquisition since it knew that the freeze would be lifted shortly and that other stations would come on the air in Phoenix in a matter of months. Actually, from its knowledge of the industry and experience elsewhere, plaintiff looked forward to and welcomed other stations

in order to better develop the market which was fully capable of supporting additional stations.

Nor did plaintiff's witnesses attach any particular value to the television broadcast license which it acquired in 1952, since in the smaller markets such as Phoenix, given the state of the industry existing and foreseeable in 1952, plaintiff thought it was not possible to conduct a profitable operation except with the additional element of network affiliation.

Radio station KPHO–AM, which plaintiff acquired at the same time it acquired KPHO–TV, was not regarded by it as a particularly good one and plaintiff's witnesses assigned no value to it in excess of the tangible assets. For calendar year 1950, the station had experienced a net loss of $7,266.85; for calendar year 1951, it had an operating profit of $12,877.73, together with a gain on sale of assets of $9,256.99, for a gross profit before income taxes of $22,134.72 and a net profit after taxes of $18,230.36. The station did not have a good frequency; it ranked seventh among the eight stations in the Phoenix area; its past history, in plaintiff's view, was not encouraging from an earnings standpoint; and plaintiff considered that it had no particular earning potential. In addition, the radio industry as a whole was depressed in 1952 when plaintiff bought the station. KPHO–AM was affiliated with the ABC radio network at the time of plaintiff's acquisition and plaintiff retained that affiliation through 1958. However, the affiliation had no particular value for in contrast to television the most attractive radio programming was available from non-network sources, and there was no dependence upon a network in this respect.

As part of the initial distribution in August 1952, Phoenix Television and Phoenix Broadcasting assigned their television and radio advertising contracts to plaintiff, none of which had a remaining term in excess of 51 weeks. These contracts, aggregating some $308,000,

varied as to duration, type of advertising material, length of announcement or program, hours of the day when material was to be broadcast, number of broadcasts per week, and rate charged.

Another intangible asset which plaintiff acquired was going concern value (which is somewhat akin to goodwill). For when KPHO–TV was purchased by plaintiff, it was operating as a stable business with a staff of operating personnel and advertising salesmen—which factors enabled plaintiff to get started right away, rather than developing the business from the ground up. Plaintiff did not consider the calibre of the operating management and staff of KPHO–TV (or KPHO–AM) as satisfactory, nor did plaintiff believe they enjoyed any particularly advantageous reputation in the community. As a result, during the months following the acquisition, the general manager and a substantial number of employees were replaced. The station did not, however, have any particular goodwill in the sense of viewer preference or loyalty to the station. This is because television audiences are attracted primarily by the programs and not by the particular broadcast station, call letters, station personnel or management. Nor do television stations (including KPHO–TV in 1952) have any particular goodwill in the sense of advertiser preference for the station. Television advertisers basically buy the attention of an audience on the best terms available or the lowest cost per thousand, and they place business with a station on the basis of the station's ability to reach an audience.

It has previously been recounted that when plaintiff acquired KPHO–TV in 1952, it recognized that it would lose some of its television network affiliation contracts as more stations entered the market, but expected to retain either CBS or NBC, and at the worst was confident of retaining ABC. But contrary to these expectations, in the years that followed KPHO–TV lost all of its network affiliations. Thus, the station remained affiliated with NBC until August 1, 1953, when the affiliation was terminated by NBC; with ABC until March 1, 1954, when the affiliation was terminated by ABC; with DuMont until it went out of existence as a network in September 1955; and with CBS until June 15, 1955, when the affiliation was terminated by CBS. Since June 15, 1955, KPHO–TV has operated as an independent station not affiliated with any television network. Following termination of its affiliation with KPHO–TV, NBC affiliated with KYTL–TV, channel 12 in Phoenix, which had gone on the air in April 1953, and ABC affiliated with KOOL–TV, channel 10, the owner of which also owned KOOL–AM, the CBS radio affiliate in Phoenix. After CBS terminated its KPHO–TV affiliation, the KOOL–TV affiliation with ABC was terminated and KOOL–TV became affiliated with CBS. ABC in turn affiliated with KTVK–TV, channel 3.

As a result of the termination of the CBS affiliation on June 15, 1955, (i) KPHO–TV lost all future revenues from network programs, which revenues amounted to $223,000 in the fiscal year ended June 30, 1954, and $301,000 in the fiscal year ended June 30, 1955; (ii) it was deprived of network programs and forced to purchase substitute programs—principally syndicated half-hour films and feature films—at its own expense; (iii) its program costs, particularly film rental costs, were substantially increased (its film rental costs for fiscal 1956 were $213,000 as contrasted with $96,510 for the preceding fiscal year—while its total program costs for fiscal 1956 were $398,000 as compared with $308,000 for the preceding year); (iv) a large share of its national spot announcement contracts were canceled notwithstanding rate reduction; and (v) it dropped from top to bottom in audience ranking during the prime evening hours, although it was able to compete successfully with the network affiliated stations in other than prime time. Because of these factors, the termination of the CBS affiliation adversely affected KPHO–TV's operating results. The sta-

tion's substantial operating profits became substantial operating losses which continued until 1963 when the station, for the first time after the CBS termination, began operating profitably. Thus, for fiscal 1954 and 1955, the station had operating profits of $307,000 and $246,000, respectively. By contrast, for fiscal 1956—the first year after the CBS termination—it incurred an operating loss of $189,000. The station continued in the red for each succeeding year through 1961 with operating losses ranging from $124,000 to $207,000 per year. In 1962, the operating loss was reduced to $41,000 and in 1963, the station earned its first profit after the CBS termination— amounting to $122,000. Its profit in the following two years then increased steadily, the station earning $184,000 in 1964 and $481,000 in 1965.

■ Against this background, we hold that the network affiliation contracts were intangible assets of significant value. The question remains, however, as to whether such contracts are susceptible of valuation separate from all of the other intangible assets. The answer is in the affirmative for it is clear that the intangible value of a business is divisible into its identifiable constituent elements. E. g., Parmelee Transportation Co. v. United States, 351 F.2d 619, 625, 173 Ct.Cl. 139, 148 (1965); Indiana Broadcasting Corp., 41 T.C. 793, 807 (1964), rev'd on other grounds, 350 F.2d 580 (7th Cir. 1965), cert. denied, 382 U.S. 1027, 86 S.Ct. 645, 15 L.Ed.2d 539 (1966); Maurice A. Mittelman, 7 T.C. 1162, 1170 (1946); Strauss v. United States, 199 F.Supp. 845, 850–851 (W.D.La.1961); Webster Investors, Inc. v. Commissioner of Internal Revenue, 291 F.2d 192 (2d Cir. 1961).

■ It is to be noted that considerable confusion has arisen in this area because of the shifting meaning of the term "goodwill." In some instances, the term "goodwill" is used in a broad sense —in accordance with terminology frequently used in the accounting profession—to describe the aggregate of all the intangibles of the business, including such items as patents, trademarks, leases, contracts, franchises, etc. In other instances, the term is used in its narrow sense to refer to the traditional concept of goodwill as a matter of favorable customer relations, i. e., as a reasonable expectancy that old customers will return to the old place without contractual compulsion. Merle P. Brooks, 36 T.C. 1128, 1133 (1961); Commissioner of Internal Revenue v. Seaboard Finance Co., 367 F.2d 646, 649 (9th Cir. 1966) and cases cited; In re Brown's Will, 242 N.Y. 1, 6, 150 N.E. 581, 582, 44 A.L.R. 510 (1926). See generally, McDonald, Goodwill and the Federal Income Tax, 45 Va.L.Rev. 645 (1959); Note, An Inquiry into the Nature of Goodwill, 53 Colum.L.Rev. 660 (1953). While at first blush there might appear to be a conflict among the cases as to the concept of goodwill and its divisibility, on analysis the differences are actually no more than differences in terminology employed to say the same thing. For example, this court in *Parmelee*, speaking of informal contractual arrangements between a taxpayer and certain railroads, stated that it agreed that such "arrangements were a part of the general goodwill or intangible value of the transfer business. * * *" 351 F.2d at 625, 173 Ct.Cl. at 148. On the other hand, the Tax Court in *Indiana Broadcasting*, speaking of network affiliation contracts, stated that " * * * an asset or service [i. e., a network affiliation contract] that will attract customers is not goodwill." 41 T.C. at 807. However, the two decisions reach the same result and are perfectly harmonious. In *Parmelee*, this court makes it apparent that it is equating "goodwill" with the total intangible value of the business and goes on to say that in this sense, goodwill is unquestionably divisible. "While we agree [the court declared] that the arrangements were a part of the general goodwill or intangible value of the transfer business * * * we reject the notion that goodwill is indivisible." Ibid. In *Indiana Broadcasting*, the Tax Court is saying that par-

ticular and identifiable assets are not components of "goodwill" when that term is used in the narrow sense and thus achieves divisibility by not including other intangibles in the first instance. Both cases, therefore, say that the identity of a particular business arrangement or contract (informal contracts with the railroads in *Parmelee* and a network affiliation contract in *Indiana Broadcasting*) is not lost and that the aggregate intangible value of a going business is composed of separate intangible assets which may be separately identified, valued and treated for federal tax purposes, regardless of what terminology may be employed. Another Tax Court case exemplifying the same principle as *Indiana Broadcasting* and using the term "goodwill" in the narrow sense is *Maurice A. Mittleman*, supra. There, in considering whether a well-known shoe brand franchise and a lease were goodwill, the Tax Court stated that "they were assets, within themselves, separable and distinguishable from all other assets, including goodwill, and susceptible to separate valuation." 7 T.C. at 1170. See also Nice Ball Bearing Co., 5 B.T.A. 484 (1926); Commissioner of Internal Revenue v. Seaboard Finance Co., supra. Other courts using their own and somewhat different terminology have uniformly reached the same result. Thus, in Strauss v. United States, supra, the District Court used the term "goodwill" in a hybrid sense speaking of the goodwill attached to a particular franchise but clearly specified what was meant by its terminology and reached the same result as the previous cases holding the aggregate of the intangible value of the business to be divisible. See also Webster Investors, Inc. v. Commissioner of Internal Revenue, supra; Metropolitan Laundry Co. v. United States, 100 F.Supp. 803 (N.D. Cal.1951).

 The short of the matter is that when plaintiff acquired the operating assets of KPHO and KPHO–TV it acquired, among other things, television network affiliation contracts which were separate, identifiable and distinct assets which were susceptible of separate valuation and when it lost these network contracts, it lost separate, distinct and identifiable assets. Defendant disputed this before the commissioner but does not do so here.

 It is clear, of course, that no deduction is allowable for an indivisible asset until the whole asset is lost. E. g., Golden State Towel & Linen Service Ltd. v. United States, 373 F.2d 938, 179 Ct. Cl. 300 (1967); Boe v. Commissioner of Internal Revenue, 307 F.2d 339 (9th Cir. 1962); Dodge Brothers v. United States, 118 F.2d 95 (4th Cir. 1941). See also Note, Tax Treatment of Losses Incurred on the Sale · or Abandonment of Purchased Goodwill, 62 Yale L.J. 640 (1953). But this has nothing to do with deductibility for the loss of a separate, distinct and readily identifiable intangible asset such as a network contract (or a lease, franchise, option, etc.). Upon the loss of such an intangible, a deduction is properly allowable. Parmelee Transportation Co. v. United States, supra, 351 F.2d 626, 173 Ct.Cl. at 150, and cases cited.

 Again proceeding on the premise that the asset in question is a specific item of goodwill or the expectancy of continuing network affiliation, defendant further argues that Phoenix Television did not have such an expectancy to sell but that such expectancy arose from the stature of the Meredith organization. Therefore, the argument concludes that plaintiff did not purchase this expectancy from Phoenix Television and consequently has no basis for it. But again the premise of the argument is erroneous. For (as we have seen), the asset in question is not an "expectancy" or a form of goodwill; it is rather what it purports to be—an ordinary bilateral contract under which a station is assured of a supply of attractive programs and concomitant advertisers and advertising revenue. See *Indiana Broadcasting Corp.*, supra. It may well be that plaintiff had a greater expectation or prospect of obtaining net-

work renewals than Phoenix Television; this would hardly be an unusual type of situation, however. Buyer and seller seldom have identical expectations or prospects for property being sold—but this bears no rational relationship to basis determinations. Put another way, the network contracts constituted property and not goodwill for tax purposes and, therefore, whether the buyer or seller had the greater expectation of securing renewals is immaterial.

██ The task remaining—starting with the agreed proposition that plaintiff's total cost and income tax basis for all intangible assets (other than the tower lease) is $459,706—is to allocate this cost among the particular intangible assets which the parties have agreed consisted of (a) television network affiliation contracts; (b) television and radio broadcast licenses; (c) goodwill of the radio and television stations; and (d) television and radio advertising contracts. Since there are several distinct assets embraced by this aggregate of $459,706, such total cost must be allocated among them in accordance with the relative value of the intangible assets acquired. E. g., Clifford Hemphill, 25 B.T.A. 1351 (1932); Hazeltine Corp., 32 B.T.A. 4 (1935), aff'd 89 F.2d 513 (3d Cir. 1937); C. D. Johnson Lumber Corp., 12 T.C. 348 (1949).

Television network affiliation contracts. There is little doubt that plaintiff was looking for a profitable business, and, indeed all of the evidence presented by plaintiff was designed to show that plaintiff's ultimate object in purchasing KPHO–TV was to earn a profit; that in 1952, in a market the size of Phoenix, though a license was a sine qua non, it alone held forth little prospect of a profitable operation; that plaintiff believed the key to profitability was network affiliation; and that for this reason it was never interested in buying non-affiliated television stations in any market. But the value of the affiliation contracts plaintiff acquired must not be overrated.

Plaintiff emphasizes that part of the value of its affiliation contracts was its expectation that it would maintain at least one major affiliation. However, maintaining at least one affiliation after the freeze was lifted was not as certain as plaintiff would like us to believe. As early as 1945, four VHF channels had been assigned to the Phoenix-Mesa area. Before the freeze, however, only one license had been issued in that area, but at the time of purchase plaintiff was on notice that as many as three additional stations could operate with the area as soon as the freeze was lifted. At the time of purchase plaintiff also knew the date the freeze would be lifted. Thus, there existed the chance which eventuated that plaintiff's station might end up without any affiliation at all.

This serves to differentiate the instant litigation from *Parmelee,* supra. In that case the asset which was lost was an arrangement with railroads operating into Chicago, by which Parmelee and Parmelee alone carried transcontinental passengers and their baggage between the Eastern and Western railroad stations, there being no Union station used in common and no through rail passenger service. There was no competitor and no one else rendered similar service on any scale or, apparently, had the equipment or expertise to do so. Therefore, though the arrangements were terminable at will, it was reasonably foreseeable that they would never be terminated. Parmelee had assigned them a value on its books of $1,322,819. That they were terminated was due to unforeseen circumstances including the "indiscreet" intervention of an ICC Chairman, which when aired in Congress led to his resignation. Here the contracts to be valued had fixed terms, but the loss was not suffered as to such terms. After those terms ran, they were in effect extendable at will, and so far the case resembles *Parmelee.* But instead of looking forward to indefinite extensions, plaintiff here knew that upon the end of the freeze, three out of four of its affiliation contracts were sure to be terminated.

The most it could expect to retain was one. There would be an entirely new ball game. What the value alleged by plaintiff inheres in is a mere possibility of extension. Where in *Parmelee* the asset was carried on the books, before the loss, at a value equal to that claimed in the tax litigation, here we have no documentary evidence relied on that plaintiff ever assigned to its affiliation expectations, per se, a value for any non-tax purpose.

The hope of retaining the CBS affiliation was clouded by the fact that the CBS radio affiliate in Phoenix was known to be a potential television licensee. It was testified that an official at CBS at some time said he was pleased that Meredith owned the Phoenix station and expressed the hope that CBS and Meredith would have a continued relationship over a number of years. If this occurred before plaintiff became committed to buy the station, plaintiff could not but have recognized it as the kind of assurance some businessmen, and some Government officials, are expert in giving, which induce others to invest effort and capital, while committing themselves and their organizations to absolutely nothing. It added no real value to plaintiff's expectation.

The most one can say is this: the possibility of continued affiliation had value is shown by the fact that plaintiff was willing to gamble $1,500,000 because of its existence. A lottery ticket has some value. Clearly this gamble was worth nothing like the value that firm assurance of affiliation with a major network would have had, or even the kind of assurance Parmelee thought it enjoyed. The inference is inescapable that a substantial part of the value of the intangible assets must have inhered in assets other than the affiliation contracts, at least in the minds of plaintiff's management at the time it purchased the stations. This conclusion is aided by our rejection of testimony assigning no value to the license, as discussed infra. The stipulation, fixing a total for all intangibles, makes the value of other assets a factor in appraising the affiliation contracts. The parties have offered evidence taking extreme all-or-nothing positions, neither of which we find reasonable or based on a factual foundation. We think the value of the intangibles, that is, their capacity to produce a profit, was created largely by plaintiff's vendor having combined them in one ownership, and would all alike have been destroyed by being severed. Obviously, e. g., an affiliation contract would have been worthless to one who had lost his TV license. If plaintiff had purchased the station without network affiliation it could have acquired temporary affiliations at once, so far as appears, such as the vendor had. Affiliations were hard to get only when stations had to compete for them.

In the circumstances, an accurate allocation of value among the several classes of intangibles is impossible, and we must make the broadest kind of estimate.

In the recent case of United States v. Northern Paiute Nation, et al., 393 F.2d 786, 800, 183 Ct.Cl. 321, 346 (1968), we had to consider the extent to which, in determining the value of property, the trier of fact, there the Indian Claims Commission, is bound by opinion testimony. We said:

> The Indians' other complaint about the findings is that the Commission rejected its expert appraisers' views, and did not spell out why in detailed findings. In legal appraisement, however, widely divergent opinion testimony is the rule rather than the exception. The trier of fact must decide first, of course, if such testimony is competent and admissible. Before us, no party claims that this case was decided with respect to any issue on inadmissible testimony. The Indians wanted the Commission to take up the reasoning of its appraisers step by step, and either accept each step or show reasons for rejecting it. Having competent testimony before it, the Commission was not restricted to swallowing it whole or rejecting it utterly. It did not have to refute what it did

not accept as controlling. It could, and apparently did, synthesize in its mind the immense record before it, determine to what extent opinion evidence rested on facts, consider and weigh it all, and come up with figures supported by all the evidence, perhaps, though not identified with any of it.

\* \* \*

In light of the foregoing, we conclude that the value of intangibles allocable to the network affiliation contracts was $250,000.

Our trial commissioner, accepting plaintiff's testimony, found the affiliation contracts were worth at least $500,000. In determining the true figure to be worth half that we give weight to the following apparent errors in plaintiff's computations: (1) they failed to adjust sufficiently for the speculative character of plaintiff's expectation that it would retain a profitable affiliation when all the prospective channels were licensed and operational; (2) they failed to recognize that affiliation contracts in the standard terminable form were available for the asking to anyone who had, during the freeze, the sole licensed and operational TV station in the area; (3) so far as the alleged value was supported by the alleged worthlessness of the license, that prop fails when one finds, as we do, that the license was not worthless.

Goodwill—going concern value. Plaintiff's expert witness dealt with the question of going concern value specifically. In ascribing a value to the fact that KPHO–TV was an organized, viable business, the factors that plaintiff's witness took into consideration were the assembling and training of a staff and the soliciting of advertising contracts. He also included the cost of obtaining an FCC license in his estimate although he did not consider the inherent value the license had for plaintiff in the context of going concern value in this case. Plaintiff argues that it did not attach any value to the licenses, while defendant, on the other hand, urges that all of the price plaintiff paid for the intangibles should be attributed to the licenses. We cannot accept either position.

Plaintiff says it did not attach any value to the FCC broadcast licenses, but without them, plaintiff could not have operated its television or radio broadcast businesses. An FCC license is the sine qua non of broadcasting. We have found that all television stations necessarily consider an FCC license their most important asset in the sense that it is essential to the legal conduct of their business and without it their business would cease. The value of a broadcast station without an FCC license would not exceed the salvage value of its physical assets. Also, an FCC license is, from a practical standpoint, a more permanent arrangement than a network affiliation contract.

██ Plaintiff's witnesses repeatedly emphasized the fact that plaintiff was only interested in affiliated stations as that was the key to profitability and that plaintiff was primarily looking for a profitable business. However, two of the three network-affiliated stations plaintiff acquired were operating at losses when plaintiff acquired them. This does not mean that they had no potential for profit; it does, however, show that plaintiff's argument that a license without an affiliation was a license to lose money and therefore valueless is somewhat unpersuasive as in these situations the network affiliations did not guarantee a profitable operation. We believe that an asset need not guarantee an immediate profitable operation to have value. It may demand years of losses or starting-up costs. None of the assets plaintiff purchased could guarantee it a profitable operation, but this does not mean they were without value.

It also appears from the record that plaintiff preferred acquisition of licensed, operational stations rather than to seek new licenses in competitive hearings, which were often expensive and time-consuming. At the time plaintiff purchased KPHO–TV the freeze was in effect and procuring a license through a comparative proceeding was temporar-

ily impossible. Thus plaintiff used the only method it could to obtain a license. Had there been no freeze plaintiff would have had a difficult time getting a license in Phoenix because the FCC tended to favor local applicants in awarding licenses. Thus, apart from the freeze, the method used by plaintiff here was the quickest, least expensive and most certain method of obtaining a broadcast license.

■ Plaintiff's expert conceded a going concern value, without the licenses, in the range of $25,000 to $50,000. We think the licenses raise this figure to $175,000. Even though severed for tax purposes, the licenses and the affiliations each added value to the other, and each would have alike been worthless without the other. They were in fact united on the valuation date and must be valued in that posture. Plaintiff's evaluation of the licenses suggests a real estate appraiser who might testify that a city lot, on which stood a valuable building, was worthless because if the building were not there the lot would return the owner no income.

The licenses include the license of the radio station which has some slight value, we think, but minimal in relation to the other value figures in the case, for the reasons indicated, infra. Such amount includes the cost reasonably associated with starting from "scratch" and obtaining a license, training a staff, and the inherent value of the licenses in the conduct of a broadcasting business by a company having network affilations.

Radio intangibles. The record establishes that apart from the value of the radio license the radio station had no intangible value. Plaintiff was not interested in KPHO radio which it did not consider a good station. The station had not been a profitable one prior to plaintiff's acquisition and its potential was not encouraging. As it turned out, plaintiff was justified in its gloomy view since KPHO radio showed steady operating losses for the first five years of plaintiff's ownership.

There were various reasons for this adverse situation. The radio industry in general was in a phase of decline in this period and station prices were depressed. Television was making serious inroads. In Phoenix there were eight stations on the air in 1952 and KPHO's frequency was not a particularly good one. The station ranked seventh among the eight stations. The fact that the station had an ABC radio affiliation was of no particular value, for in contrast to television the most attractive radio programming was available from non-network sources and there was no dependence upon a network in this respect.

■ Advertising contracts. Among the intangibles acquired by plaintiff were contracts for the sale of radio and television time to various local, regional and national advertisers. These contracts specified the type and frequency of advertising to be performed as well as the rate charged; they had varying periods of time remaining at the acquisition date from one week to one year but none were in excess of one year. The unearned gross revenues at the date of plaintiff's acquisition were approximately $45,000 for radio contracts and $263,000 for television contracts, for a total of $308,000. However, the contracts had additional value because of the probability that some of the advertisers would continue their patronage. On the other hand, the contracts were, in practice, freely cancellable on 28 days' notice.

Plaintiff's expert witness indicated that it might be proper to ascribe a separate value of $26,000 to the television advertising contracts based on the assumption that the station would earn a 10 percent profit after tax on the aggregate $263,000 remaining. This estimated value of $26,000 would appear to be understated, however, for failing to give any consideration to the probability of renewals.

Defendant's witness, on the other hand, estimated the value of the television and radio contracts at $100,000. He

proceeded on the basis that it would cost one-third of the gross amount payable, namely $300,000, to reproduce such contracts, i. e., to hire and train competent personnel, make an extensive survey and solicit prospective advertisers. The estimate of $100,000 would appear, however, to be considerably overstated. For one thing, the radio station, as we have seen, had little intangible asset value. Therefore, limiting the inquiry to the television advertising contracts, their value, on the witness' rationale, would be about $87,000 (⅓ of $263,000). But this amount would appear to be overstated too for the reason that the witness' assumption of indefinite renewal of the contracts is not altogether appropriate. It will be recalled that at the time plaintiff acquired KPHO–TV, it was the only station on the air. Its advertisers had no other stations to turn to and it was likely that some of them, seeking better time slots, better programs, lower rates, etc., would terminate their contracts with KPHO–TV and deal with the new stations as they came on the air. Under these circumstances, it is apparent that any buyer would discount to a not insubstantial extent the element reflecting likelihood of renewal of these contracts. However, it will be remembered that plaintiff expected to benefit from competition as tending to develop the market.

Based on the foregoing considerations, it is concluded that a reasonable estimate for the value of the television advertising contracts acquired by plaintiff is $75,000.

Plaintiff's independent audit filed with the FCC for its fiscal year ended June 30, 1953, and its tax return and claim for refund for 1953, as originally filed, showed the allocated cost at date of acquisition of "network and advertising contracts," $400,000. It will be noted that in our figures, the combined value of network and advertising contracts total $325,000. Plaintiff never assigned any value to the licenses but we value them as part of the "going concern value" $175,000.

■ This means that we estimate the value of. the intangibles as follows:

TV network affiliation contracts ....................$250,000
Going concern value, including licenses ................. 175,000
TV advertising contracts .... 75,000

Total ............... 500,000

The stipulated figure to be allocated is, however, $459,706. Since we have allocated just half of the value to be allocated to the TV network affiliation contracts, it follows that, pursuant to stipulation, plaintiff is entitled to a deduction for its June 30, 1953, fiscal year in the amount of $229,853.

■ The final questions for our determination are whether the $175,000 of cost allocated to going concern value which included the licenses is amortizable and whether the $75,000 of cost allocated to the television advertising contracts is amortizable. In the case of intangible assets, it is indisputable that a taxpayer is entitled to recover his cost basis through amortization deductions—provided it is shown that such assets have an ascertainable useful life. Reg. § 1.167 (a)–3 (1954 Code) and Reg. 118, § 39.23(1)–3 (1939 Code). The difficulty here is that neither the licenses nor the advertising contracts have a determinable useful life. Until 1955, a license was granted for a one year term and since then it has been for a three year term, although in practice licenses have been renewed almost automatically. In the case of the television advertising contracts "[t]hese contracts were not purchased as individual contracts. * * [Plaintiff] purchased a mass [i. e., indivisible] asset whose value will fluctuate as contracts expire and as new contracts are signed. When confronted with this issue * * * [it] had [been] consistently held [that] such a mass asset [is] not depreciable because it did not have a determinable useful life." Westinghouse Broadcasting Co., 36 T.C. 912, 923 (1961), and cases cited, aff'd

on other issues, 309 F.2d 279 (3rd Cir. 1962), cert. denied, 372 U.S. 935, 83 S.Ct. 881, 9 L.Ed.2d 766 (1963). It is quite true (as discussed before) that at the time of plaintiff's acquisition of KPHO–TV advertisers had no other stations to turn to and that with the advent of other stations, there was a likelihood that some of them would terminate their contracts with KPHO–TV and deal with the new stations as they came on the air. However, there was also the probability that other advertisers would, in the ordinary course of business, renew their contracts for an indefinite time in the future. "[Plaintiff] must show more than uncertainty as to the length of the * * * useful life." Westinghouse Broadcasting Co., supra, 36 T.C. at 921. It must show that the licenses and the advertising contracts did not possess any reasonable prospect of continuity. And this showing plaintiff has failed to make.

It is concluded, therefore, that plaintiff is entitled to a loss deduction for the television network contracts, but is not entitled to any amortization deduction with reference to the cost basis of the other intangible assets.

Judgment is entered for plaintiff in accordance with the opinion with the amount of recovery to be determined pursuant to Rule 47(c).

COLLINS, Judge (concurring in part and dissenting in part):

I agree with the court that only the television network contracts have been shown to be conceivably deductible under the applicable law. I dissent, however, on the ground that plaintiff has failed so far to prove a reasonable value to be assigned to those contracts.

The court's opinion fully states the relevant facts. On the purported basis of those facts, the court allocates $250,-000 of the stipulated value of all the intangibles to the network contracts, candidly using "the broadest kind of estimate." In so doing, the court does not refer to any evidence which suggests in a positive manner the precise value attributable to the contracts. This, in my opinion, is improper. The fault, admittedly, lies largely with the record. Nothing in the evidence authorizes a more precise statement than that the value of the contracts was an amount between zero and something less than $459,706.

It is well established that plaintiff has the burden of proving its right to a deduction.[1] Implicit in this statement is the recognition of plaintiff's obligation to prove each and every point necessary to qualify for the deduction it claims.[2] It seems to me obvious that, in the same way that proof of an asset's useful life is necessary before a depreciation deduction will be allowed, an asset's cost basis is an essential element of proof before a loss deduction is permissible.[3] As recognized in Westinghouse Broadcasting Co. v. Commissioner of Internal Revenue, 309 F.2d 279, 282 (3d Cir. 1962), cert. denied, 372 U.S. 935, 83 S.Ct. 881, 9 L.Ed.2d 766 (1963), tax-

---

1. See, e.g., Oliver v. Commissioner of Internal Revenue, 364 F.2d 575 (8th Cir. 1966); Parmelee Transportation Co. v. United States, 351 F.2d 619, 173 Ct.Cl. 139 (1965).

2. See, e.g., Mayrath v. Commissioner of Internal Revenue, 357 F.2d 209 (5th Cir. 1966) (property not shown to have been used in trade or business); Schubert v. Commissioner of Internal Revenue, 286 F.2d 573 (4th Cir.), cert. denied, 366 U.S. 960, 81 S.Ct. 1919, 6 L.Ed.2d 1253 (1961) (plaintiff must prove interest in depreciable property).

3. See Oliver v. Commissioner of Internal Revenue, 364 F.2d 575 (8th Cir. 1966), wherein it was held, in regard to the deductibility of medical expenses, that:

" * * * The taxpayer bears the burden of proving the facts necessary to establish his right to a deduction and the burden of proving the amount of the deduction. * * * " Id. at 577.

Treas.Reg. § 1.167(g)–1 (1956) (originally numbered 1.167(f)–1) provides that the basis for depreciation shall be the adjusted basis as provided in INT.REV. CODE of 1954, § 1011, for determining the gain from the sale or other disposition of property. A similar regulation existed under § 23(*1*) of the Internal Revenue Code of 1939. See 26 C.F.R. § 3.-23(1)–4 (1st ed. 1939).

payer's failure to prove the useful life of a network affiliation contract with "reasonable certainty"—the test in the regulation—resulted in a denial of the claimed deduction. Certainly the similar importance of the asset's basis to the determination of the deductible amount warrants our requiring a reasonable basis in fact for the value we attribute to the affiliated network contracts here. At least, something more than "the broadest kind of estimate" is required.

Since, however, the parties' chief concern in previous litigation has been whether the television license had any value, plaintiff may not have presented all the available evidence concerning the value of the network contracts. For that reason, in light of the complexity of this case, I would not dismiss the petition, but would remand the case to a commissioner for trial on the sole and precise issue of the value of the network contracts.