ROY H. PARK BROADCASTING, INC., PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 1600–67.  Filed July 19, 1971.

*Jerome B. Libin* and *Donald V. Moorehead*, for the petitioner.
*Stephen M. Miller*, for the respondent.

FAY, *Judge:* Respondent determined deficiencies in the income taxes of petitioner for the taxable years ending June 30, 1964, and June 30, 1965, in the amounts of $18,089.44 and $17,046.04, respectively. The issues for decision are (1) whether petitioner is entitled to amortization deductions with respect to network affiliation contracts with CBS and ABC and, if so, in what amounts; and (2) whether petitioner sustained a loss upon the termination of the secondary affiliation contract with ABC and, if so, the amount of such loss.

FINDINGS OF FACT

Many of the facts have been stipulated. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference.

Roy H. Park Broadcasting, Inc., petitioner herein (hereafter referred to as petitioner), is a corporation organized under the laws of the State of North Carolina and having its principal office in Greenville, N.C. Petitioner employed the accrual method of accounting based upon a fiscal year ending June 30 in both maintaining its books of account and filing Federal income tax returns.

Petitioner's Federal income tax returns for the taxable years ending June 30, 1964, and June 30, 1965, were timely filed with the district director of internal revenue, Greensboro, N.C.

Roy H. Park (hereafter referred to as Park) was the sole shareholder of petitioner during the taxable years in question. Prior to the acquisition of WNCT–TV on March 15, 1962, Park owned an interest in KREB, a radio station in Louisiana, serving also as officer and director of such corporation, but did not own an interest in any television stations. In the years following petitioner's acquisition of WNCT–TV Park acquired interests in five additional television and seven additional radio stations located in various cities throughout the United States. Park also owns a controlling interest in several outdoor advertising concerns.

Prior to Park's acquisition of WNCT–TV such station was owned by Carolina Broadcasting System (hereafter referred to as Carolina), a corporation. On September 26, 1961, petitioner extended an offer in writing to the shareholders of Carolina to purchase all of the stock of such corporation at a specified price. Closing date of the sale under the offer was to be between 10 and 45 days following approval of the transfer by the Federal Communications Commission (hereafter referred to as FCC).

Petitioner's original offer to the shareholders of Carolina, amended on October 10, 1961, to reflect a change in the asking price of the stock, was recommended for acceptance by the board of directors of such corporation by letter dated October 16, 1961. As of December 11, 1961, more than 90 percent of the outstanding shares of Carolina stock had been deposited with an escrow agent designated in the offer. On December 12, 1961, Carolina filed an application with the FCC for consent to the assignment of its broadcast license to petitioner, as required for the transfer of licenses under the FCC rules. Legal expenses associated with the process of securing such consent were $20,000. FCC approval of the transfer was granted on February 6, 1962. On March 15, 1962, the sale of Carolina stock to petitioner for a total sales price of $2,556,168 was consummated. Adding to this sum the $20,000 cost of securing approval of the license transfer, petitioner's aggregate basis in the Carolina stock amounted to $2,576,168 at the time of acquisition.

On March 15, 1962, Carolina merged with petitioner corporation, all the assets of Carolina being thereupon transferred to petitioner, the surviving corporation, in a transaction qualifying under section 334(b)(2) of the Internal Revenue Code of 1954.[1]

---

[1] All statutory references are to the Internal Revenue Code of 1954 unless otherwise indicated.

On its books petitioner allocated the $2,576,168 basis of the assets acquired in the merger among the assets as follows:

| | |
|---|---:|
| Tangible assets | $1, 457, 170. 23 |
| Cash and other quick assets | 329, 409. 00 |
| Atlantic Telecasting stock | 300, 000. 00 |
| Network affiliation contracts | 489, 588. 77 |
| Total | 2, 576, 168. 00 |

On its Federal income tax returns for the years ending June 30, 1962, and June 30, 1963, petitioner did not deduct amortization with respect to its affiliation contracts.

The above allocation was modified by an agreement between the parties sometime prior to June 30, 1964. This agreement was reached during the course of an examination by respondent of petitioner's records relating to the valuation of the tangible assets acquired in the transaction described above. The agreed allocation reduced the valuation of such assets by $206,051.23, raising the aggregate allocation to network affiliation contracts by a corresponding amount—from $489,588.77 to $695,640. The allocation did not break down this composite figure to reflect the value of each network affiliation contract individually. For each of its taxable years in question petitioner claimed deductions of $34,782 as amortization of its network affiliation contracts. Thereafter, petitioner filed claims for refunds with respect to taxable years ending June 30, 1962, and June 30, 1963, claiming amortization deductions for those years as well.

The nature of the broadcast spectrum requires exclusive use of a given frequency in the area in which the signal is received to prevent electrical interference between stations. For this reason television broadcasting stations operate on channels assigned by the FCC. There are 12 very high frequency (VHF) channels numbered 2 to 13, and 70 ultra high frequency (UHF) channels, numbered 14 to 83. Varying numbers of channels are allocated to particular market areas by the FCC, and each allocated channel may be assigned to a particular applicant by the granting of a construction permit and, upon completion of construction and demonstration of compliance with FCC technical requirements, by a license.

Television broadcast signals emanate from stations which, in the cases of both VHF and UHF, are capable of transmitting their signals over a limited area surrounding the station. The precise reach of a television station varies directly with the height and power of the transmitting tower and the character of the terrain over which the television waves are beamed. Thus, given an adequate separation between stations, any number of stations can operate on the same frequency (or channel) without mutual interference. To prevent

such interference, the FCC rules provide generally that stations broadcasting on the same channel must be at least 180 miles apart. In some cases special permission is granted for the construction of a station within 180 miles of an existing station using the same frequency. In such cases, however, restrictions with regard to the level of power at which the second station may operate are imposed by the FCC in order to avoid interference with the existing station.

Where more than one applicant files for a single television assignment, the FCC is required by law to hold a formal proceeding to select the applicant best qualified. Such a comparative hearing is both an expensive and time-consuming procedure. The assignment of an existing television license, however, though subject to FCC approval, does not require such a hearing. Thus, a qualified transferee of a television station can reasonably expect to secure FCC approval.

Construction permits granted to successful applicants after a comparative hearing are salable but FCC rules prohibit the realization of a profit upon sale. Thus, under FCC rules the sale price of a construction permit cannot exceed the costs of securing the permit, such costs typically consisting of fees paid to attorneys, engineers, or other professionals whose services are engaged in acquiring the permit. Once the station is constructed, all rights under the construction permit are merged into the license, which is issued as a matter of course to the holder of the construction permit. Unlike the construction permit, a license is not independently salable, but can be sold only upon the transfer of an operating station. There is no FCC restriction analogous to the prohibition upon the sale of a construction permit at a profit applicable to broadcast licenses.

Commercial operation of television stations was first approved in 1941 when the FCC authorized 18 VHF channels, and by 1945 six commercial stations were in operation. In late 1945 the FCC adopted a table of assignments allocating VHF television channels throughout the United States. Network operations in television began on a large scale basis in 1948 with the opening of extensive "interconnection" facilities of the American Telephone & Telegraph Co. for transmission of television programs between cities by means of coaxial cable and, later, by microwave relay.

On September 30, 1948, the FCC stopped processing applications for new television station construction permits and did not resume processing such applications until July 1, 1952, at which date there were 108 VHF television stations in operation. This period during which applications were not processed is referred to in the industry as "the freeze."

The basic goal of the FCC's television channel allocation policy since the freeze has been to provide for a system of competitive nation-

wide and local television broadcasting securing the largest feasible number of program choices and competitive outlets for local expression. Pursuant to this policy, the FCC has consistently sought to provide for a number of comparable broadcasting outlets in a given market area at least equal to the number of national television networks.

In April 1952 the FCC published a new allocation of VHF channels, and its first allocation of UHF channels, to market areas throughout the country.

Prior to the freeze, all commercial television stations in operation were VHF stations and all television sets manufactured for sale to the public were capable of receiving only VHF stations. At the end of the freeze, in furtherance of its national policy to develop competitive television broadcasting, the FCC authorized the use of UHF channels for commercial broadcasting. By January 1, 1954, there were 121 UHF commercial stations on the air and a small percentage of television sets manufactured at this time were capable of receiving both VHF and UHF stations. However, the number of UHF commercial stations in operation declined annually to a low of 76 in 1960, as did the percentage of television sets manufactured to receive all television channels. In 1962, pursuant to the long-established policy to encourage the use of UHF stations, Congress enacted the All-Channel Receiver law (Pub. L. 87–529), which authorized the FCC to make rules requiring that all television sets shipped in interstate commerce were to be capable of receiving both VHF and UHF stations. The FCC adopted such rules effective April 30, 1964.

Commercial television has grown steadily from the time of the freeze to the present. Thus, the number of television stations has increased from 108 in 1952 to 673 in 1969. The term "television market," employed initially by the industry and later adopted by the FCC, describes a geographical area containing one or more television stations operating on different channels. The number of such television markets increased from a low of 63 immediately following the freeze to a high of 289 in 1969. The following table shows the number of stations and markets (divided into categories of markets with less than three stations and markets with three stations or more) in sample years between 1952 and 1969:

| Year | Number of stations | Number of markets (less than 3) | Number of markets (3 or more) |
|------|------|------|------|
| 1952 | 108 | 51 | 12 |
| 1957 | 506 | 207 | 70 |
| 1962 | 557 | 183 | 91 |
| 1966 | 611 | 171 | 110 |
| 1969 | 673 | 162 | 127 |

Affiliation arrangements between a network and individual stations predominate in the industry to the mutual advantage of both network and station. Television networks are benefited by affiliations because they increase the circulation of network programs thereby raising advertising revenues. As to the local station the value to it of affiliation lies to a large extent in the income it produces under revenue-sharing features of the affiliation relationship. There are three national networks: Columbia Broadcasting System (CBS), National Broadcasting Co. (NBC), and American Broadcasting Co. (ABC).

The terms and conditions of affiliation are defined in contracts between the network and local stations. Such contracts, although individually negotiated and thus subject to minor variations from one station to another, generally conform to a set of standard provisions used by the particular network with which the local station is affiliated, each network having its own standard form. Standard affiliation contracts typically run for 2 years and contain the following provisions, among others: (1) The network agrees, at its expense, to provide programing to the station, (2) the network agrees to offer the station first call for network programs, and (3) the network agrees to pay the station a specified percentage (usually 30 percent) of the station's network time rate for all network programs broadcast by the local station. Since their prohibition effective September 10, 1963, contracts no longer provide, as they did prior thereto, for a "network option time" arrangement under which the local station is required to broadcast during specified hours of the day (with stated exceptions) all sponsored programs offered by the station.

Commercial television in the United States is supported by advertisers who purchase time and other services of television stations for the presentation of commercial messages to the public. While television is both an entertainment and an advertising medium, its income is attributable exclusively to the latter function since programs are provided free of charge to the viewing public. As an advertising medium, the value of commercial television is measured, like that of other media, by the size of the audience. Advertising rates are determined almost exclusively by the size of the estimated audience. The size of the audience, in turn, is determined in the first instance by the number of homes capable of receiving the television signal and next by the ability of the programs to attract viewers. While audience rating is somewhat affected by the technical quality of transmission, as well as by various managerial factors such as program continuity and promotion, its most crucial determinant by far is the quality of the individual programs. The impact of the channel number or call letters upon audience size is relatively nominal except to the extent that a station is associated with the particular network it carries.

As indicated above, in the case of an affiliated station the major portion of its programing is furnished to it by the network without charge.[2] While an affiliated station is not obligated to broadcast network programs, the failure to clear an adequate number of hours for network programs is regarded with disfavor by networks and could lead to the termination of the affiliation upon expiration of the 2-year contract. The balance of the programs broadcast by the local station are those which, in contrast to network programs, are produced by the individual station. Examples of such programs are locally produced news reports, sports shows, discussion groups, and films.

Television programing has always been very expensive to produce. As a result television is an economical and effective advertising medium only if it is capable of attracting large audiences so that the cost of advertising per thousand viewers, a statistic of considerable importance in the television industry, is reduced to a minimum. Network programs, because they are marketed across the nation through their affiliates, will characteristically have vastly larger circulation than locally produced shows. Since "cost per thousand" is the key measure of economic feasibility, networks are thus in a position to spend far greater amounts in the production of their programs than local stations. As a result, local programs are not generally competitive with network shows. In order to fully understand the effect of network affiliation upon profitability of a station, it is necessary to explore in detail its exclusive source of revenue—advertising.

Advertising can be divided into three broad classes known as network, national spot, and local spot. Network revenues consist of the local station's share (usually 30 percent) of the sums charged to advertisers for the use of the individual station's facilities in broadcasting network programs (known as network card rate). Spot advertising refers to the direct sale by a local station of either advertising time during nonnetwork programs or, in the case of network programing, of that portion of advertising time which remains available for the use by the local station after network advertising has been provided. Local advertisers are those who purchase program time or adjacencies[3] from local stations. Thus, an advertiser may obtain nationwide advertising coverage either by purchasing station time through a network or by dealing with selected stations individually through station representatives. National and regional advertisers may also select stations in specific areas in which coverage is desired or in which they have marketing objectives. The station retains the full proceeds of nonnetwork national, regional, or local advertising (less commissions) as opposed to a percentage of its card rate for network adver-

---

[2] There are some very minor costs which we ignore for present purposes.

[3] This term is discussed *infra.*

tising. However, the sale of national or regional advertising generally involves the intervention of various advertising representatives who are compensated on a commission basis. For national advertising, the total commission rate is approximately 30 percent while that of regional advertising is approximately 25 percent. In the case of local sales generally, sales costs of 10 percent plus program costs of 15 percent also add up to a cost rate of 25 percent.

Television advertising has taken various forms. An advertiser may present a program, together with commercial messages, on time purchased from the station. Alternatively, an advertiser may purchase participating announcements which are interspersed throughout an individual program. An advertiser may also purchase an adjacency (or announcement), generally of 10, 20, 30, or 60 seconds' duration, for presentation during the time interval between programs. An adjacency is a time segment retained by the station which is sold directly to advertisers. The size of the audience which can be expected to view a particular adjacency is determined by the estimated audience of programs which precede and follow the announcement.

In addition to their network time rate, affiliated stations typically have a national spot rate and a local spot rate which are offered to national, regional, and local advertisers. These spot rates vary directly with the size of the potential viewing audience; thus, the larger the audience, the higher the spot rate.

In the case of a network affiliate the network rather than the local station bears the cost of purchasing or producing most prime time programs—in order to broadcast these programs, the network affiliate need only flip a switch setting the interconnecting facilities of ITT in motion, the affiliate incurring no direct expenses in the process. Where an affiliate undertakes to broadcast a local program, however, it must at its own expense purchase or produce the audience-getting program. However, the affiliate's nonprogram costs remain constant whether it broadcasts network shows or locally originated shows in a particular time segment. Nonnetwork sources of programing for local stations include movies, public service shows, syndicated independent programs, reruns of network programs, and local live programs such as news, women's shows, and children's shows. Station expenses incurred with respect to locally originated programing are typically greater than expenses associated with network programs. Moreover, the relative audience interest in nonnetwork programs as compared to network programs, together with the power of the signal emitted by the station, affects the salability of adjacencies, which in turn affects the station's gross revenues.

An unaffiliated local station must incur the expenses of production and sale with regard to all of its programing, whether or not its ad-

vertising time is completely sold. Moreover, it may be impossible for an unaffiliated station to buy programing at any price that will compete effectively with network programs for audience. In addition, unaffiliated stations do not enjoy the promotion value that networks supply to their affiliates through the use of national media advertising campaigns.

Thus, the affiliation relationship is of great value to an affiliate, particularly in a small market where the local station, in competition with affiliated stations, would otherwise find it difficult, if not impossible, to survive. It furnishes quality programing to the local station which could otherwise be obtained, if at all, only at considerable expense and effort. More important, given the fiscal realities of television production, locally produced programs often cannot under any circumstances compete with far superior network shows. Translated into income, the availability of network programing means the production of income in two forms—first, from the network as its share of the network rate charged to advertisers and, second, from the sale of adjacencies or spots at significantly higher rates due to the enhanced popularity of the programs carried. Higher rates associated with network programs are due to the sensitivity of advertising rates to audience command which, in turn, is based upon the quality of the programs shown (which programs are generally superior, at least from the standpoint of attracting viewers, in the case of network programs). On the other side of the coin, nonnetwork programs provide somewhat more salable advertising time to the station. Thus, nonnetwork broadcasts may produce higher gross revenues from both spots and network local advertising than network programs. However, high costs of production with respect to these programs more than offset this margin so that net profits of network programs ultimately exceed those of nonnetwork programs.

It is obvious, therefore, that the affiliation contract is highly regarded by prospective purchasers of a television station and figures prominently in the decision to purchase as well as in the price to be paid for a television station. In general the factors which affect the value of a station are its "physical facility" and earnings capacity as reflected by past and potential profits. Included in the term "physical facility" is the size of the market covered and the physical capacity of the station to service that market.[4] Physical attributes of a station which determine its ability to deliver coverage are the height and quality of the transmitting tower and the topography of the land over which the signal is beamed. The effect of a network affiliation upon valuation of a station is attributable to its dramatic impact upon the

---

[4] Capacity of a station to service a market is determined not only by the physical plant but also by the terms and conditions of the FCC license issued to the station.

station's earning capacity. Since network affiliation contracts are transferred only in the context of the sale of an operating station and price allocations to affiliations are rarely, if ever, made in those instances, valuation of such contracts by reference to other sales is impossible. Thus, valuation of an affiliation of necessity involves consideration of a variety of factors, the most important of which is its contribution to the station's earnings, that constituting the most significant measure of station value.

Although of great value to the affiliate, network affiliations are bestowed upon the chosen station without any charge to it whatsoever. Thus, a station constructed from the ground up (in contrast with the purchase of an existing station) will incur no costs which are associated with securing an affiliation. The reason affiliation is so generously conferred upon stations is that the network is as eager as the station to enter into affiliation so as to secure an outlet in the market. Indeed, where there are more networks than stations in a market, networks will compete with one another for affiliations. In the reverse situation, however, it is the local stations which vie for affiliation. In balanced markets, where an equal number of networks and stations are present, the rivalry described above is reduced to the question of which station will combine with which network; almost invariably all stations and networks ultimately become affiliated however.

In selecting television affiliates, where such a choice is available, the networks consider a number of factors, including the station's management, personnel, and reputation in the community; the existence of a satisfactory relationship between a station's owners and operators; and the broadcasters' experience and history in the broadcasting field. Networks are also influenced in their decision to affiliate by the number of other stations controlled by the same owner, described in the language of the industry and FCC as a "group owner." The bond between such a group owner and the network with which it affiliates is strengthened by the presence of this factor because of the potentially harmful ramifications which may result from withdrawal of affiliation in one market. Perhaps the most important factor in determining the choice of affiliation is the coverage provided.

Traditionally, network programs have had the highest viewing levels during the prime evening hours from 7:30 p.m. to 11 p.m. when potential audiences are greatest, advertisers' interest the keenest, and time rates the highest. Given the limited budget available for independent programing, locally originated programs are generally at a distinct disadvantage in their competition with network programs offered during that time period. As a result, prime time audience and advertising have been largely dominated by network affiliated stations.

There are presently three television stations operating in the

Greenville-Washington-New Bern market area of North Carolina, to wit, WNCT–TV, WITN–TV, and WNBE–TV (whose call letters have been changed to WCTI–TV as of June 14, 1970). In addition, one UHF channel has been allocated to this area by the FCC but no station has yet commenced operations.

WNCT–TV (Greenville) commenced operations on December 22, 1953, as the first television station in the Greenville-Washington-New Bern market. This station was followed by WITN–TV (Washington) which began broadcasting on September 28, 1955. On February 9, 1955, a construction permit was issued to Nathan Frank for construction of a VHF station in New Bern. Construction was not started under this permit until late 1962 or early 1963. Station WNBE–TV (New Bern) commenced operations on September 7, 1963.

A television station can have affiliation agreements with more than one network. Where this is the case, one such affiliation is known as a primary affiliation and the remainder ordinarily as secondary affiliations.[5] As in primary affiliations, described above, secondary affiliation contracts provide generally for the station's broadcast of the secondary network's programs at such times as the station can arrange. The broadcasting of secondary network programs entitles the affiliate to approximately the same share of network revenues as that of a primary affiliation. What distinguishes these two types of affiliation is that under a primary affiliation, the affiliate agrees to carry a substantial portion of the programs produced by the network, whereas under a secondary affiliation, no such obligation is undertaken by the affiliate. Therefore, as a rule the affiliate's broadcasting of primary network programs far exceeds that of the secondary affiliate. In the case of WNCT–TV, the average number of ABC programs which it carried each week was approximately 11 hours, representing roughly 11 percent of its total network programing of 100 hours per week. CBS broadcasts accounted for the balance of network programing. Total network and nonnetwork programing consumed approximately 126 hours per week. Secondary affiliations are generally prevalent in markets in which there are more networks than stations. Although less desirable than a primary affiliation from the network's standpoint, networks will nevertheless enter into secondary affiliations in order to secure an outlet for its programs in markets having too few stations to support a full affiliation for each television network.

The secondary affiliation is valuable to a television station in a variety of ways. First, it permits the station to choose among a larger

[5] A double primary affiliation by one network, though rare, is a possibility and has been known to exist. In the only case cited, however, one station was VHF and the other UHF. Moreover, the UHF was what is referred to as a "bonus station" which does not receive compensation for carrying ABC programs.

selection of programs so as to attract the largest possible audience. Spots and adjacencies sold around the greater number of popular programs made available to the affiliate as a result of secondary affiliations command higher revenues since advertising rates are geared to audience ratings reflected in official television surveys. It also permits a station to schedule its strongest programs for early hours of the evening in order to attract viewers during those critical times in the hope that their televisions remained tuned to such station. This tendency of viewers to stay with one station for an entire evening is utilized with great effect by television stations seeking increased audience patronage and is known in the industry as "audience continuity." Second, it improves a station's bargaining position with respect to the network rates since several networks are then competing for the affiliate's time. Lastly, the network, desirous of having its programs broadcast, frequently allows the showing of its programs in nonprime hours while compensating the station at prime rates. This mobility in the scheduling of network programs is attributable to videotape technology which allows a station to tape programs at the time originally broadcast by the network for use at some later time. Thus, despite the existence of a primary affiliation and the availability of its programing during the majority of the hours carrying the secondary affiliation's programs, a secondary affiliation is of definite value to the station.

A comparison of the two network affiliations owned by WNCT–TV shows that in 1961, of total network broadcasts, 13 percent were ABC and 87 percent were CBS programs. Yet, the stipulated facts show that a full 32 percent of the total network income was attributable to ABC. The explanation of this peculiar circumstance is to be found first in the practice of ABC of paying prime rates for nonprime time programs, as noted earlier, and second, in the waiver by ABC of the free hours clause, normally contained in affiliation contracts, under which the network is entitled to a specified number of programs without payment of its usual rate of compensation.

An alternative method of securing programs produced by other than the affiliated network is to contract individually for programs which have not been chosen by the station affiliated with that network. This arrangement is known as "per program" contracting. It does not entitle the contracting station to network income but, on the contrary, must be paid for by the affiliate. However, the station is then free to sell its own advertising and thereby realize income. In practice, such an arrangement is regarded as unsatisfactory principally because of its dependency upon individual contracting which is considered too unreliable for an industry based heavily on audience habit. Further-

more, the local station is provided a far smaller repertory of programs to choose from than under secondary affiliations.

Where the number of stations is equal to or greater than the number of networks in a given market, barring exceptional circumstances, each of the networks enters into a primary affiliation with a separate station and each station, in turn, affiliates only with that network. In a market having less stations than networks (generally less than three stations) the addition of a new station will normally precipitate a rearrangement of network affiliations. In such cases the new station will acquire an affiliation formerly held by another station as either a primary or secondary affiliation. Although it is entirely possible for a network having a primary affiliation with an existing station to transfer over to the new station, it is a secondary network which in the majority of cases becomes affiliated with the new station. This is because the fixed relationship of the primary affiliate with an existing station is not as easily upset as that of a secondary affiliate, particularly in light of the general network policy to retain existing affiliations as long as possible.

Exhibit 11–K in evidence is a history of network affiliation contract terminations in the television industry from 1948 to 1969. The exhibit divides the population of television stations in the United States into markets and shows the date each station in the market began to operate and the network affiliations it held from its inception to 1969. A study prepared by petitioner's expert, Richard P. Doherty, segregates from the data contained in Exhibit 11–K all 126 television markets with three stations or more (whether UHF or VHF). A second exhibit presents a further refined study which analyzes the 63 markets with exactly three VHF stations, excluding those owned or operated by a network or a network satellite. The following uncontested facts emerge from these studies. Of a total 94 unstable markets,[6] 81 or 86 percent experienced a change in at least one affiliation, be it primary or secondary, as a result of the introduction of a third station in the market. Among the 13 which did not yield to affiliation changes upon entry of a third station, 11 were UHF. However, in a full 20 markets of the 81 in which there was a change of affiliation, the station which successfully precipitated the affiliation was a UHF. Of 63 stations studied in the second exhibit, 48 were unstable and in just about all of these cases termination of an affiliation, whether primary or secondary, resulted from introduction of a third station in the market. The studies do not indicate the percentage of cases in which the terminations recorded involved primary affiliations alone. It is apparent, however, that the majority involved secondary rather than primary affiliations. The evidence further shows that the time period elapsing between

---

[6] This term is discussed *infra*.

entry of the second and third stations is correlated to some degree with the size of the market—generally the smaller the market the longer the period. For markets approximating in size the Greenville-Washington-New Bern market, the period averages roughly 8 years.

Because WNCT–TV was the sole station in its market at the commencement of its operations in 1953, it acquired network affiliations with each of the four national networks then in existence—CBS, NBC, ABC, and DuMont. The affiliation with the last-mentioned network terminated upon DuMont's expiration as a national network in September 1955. At about the same time WNCT–TV's affiliation with NBC also terminated, this time as a result of the advent of a second station, WITN–TV, in the market. In 1962, therefore, at the time petitioner acquired WNCT–TV, it held two affiliations—a primary with CBS and a secondary with ABC. On the date of purchase, WNCT–TV's primary contract with CBS, dated March 30, 1956, was for a 2-year term but had, prior to petitioner's acquisition, been renewed for a term expiring March 30, 1962. This contract was transferred to petitioner upon acquisition of WNCT–TV and, by virtue of successive renewals, is still in force.

The secondary network affiliation contract with ABC was for a period of 2 years expiring November 1, 1962. This contract was also transferred to petitioner. Although petitioner had the opportunity after acquisition of WNCT–TV to acquire a primary affiliation with ABC rather than CBS, petitioner retained CBS as a primary affiliation because the latter was at the time regarded as the most valuable affiliation. For the calendar year 1961, during which period the negotiations for the acquisition of WNCT–TV were in progress, WNCT–TV received network revenue from CBS and ABC as follows:

| | |
|---|---:|
| CBS | $215,101 |
| ABC | 101,096 |
| Total | 316,197 |

Also transferred to petitioner at the time of acquisition were advertising contracts between the station and various advertisers which had been entered into prior thereto. As of March 15, 1962, the maximum gross revenue payable under the contracts, assuming no premature terminations by the advertisers, was $437,542.98. Advertising contracts, though in form enforceable by both parties, are in practice canceled at will by the advertiser. A station will not ordinarily insist upon the advertiser's performance under the contract because to do so would discourage advertisers from patronizing the station. On the other hand, the stations do consider themselves bound by the contract and will not therefore increase advertising rates during the contract term.

Such rates are subject to change at the expiration of the contract, however.

Advertising rates vary according to the audience rating received by the station in various surveys conducted. As indicated above, the size of a station's audience depends upon a variety of factors, including the quality of programs presented, number of television sets capable of receiving the program, degree of program continuity achieved by the station and promotional activities in which the station engages.

Data concerning the viewing public used by members of the television industry are compiled by two services—the American Research Bureau (ARB) and Nielsen Station Index (Nielsen). These publications survey the television markets periodically—twice a year in the case of the Greenville-Washington-New Bern market—to determine program popularity. Advertisers rely on both services in placing their television advertisements. Of 132 programs shown in the Greenville-Washington-New Bern market during the period November 7 through December 4, 1962, WNCT–TV captured 28 of the top 40 shows (rated in order of popularity) which included 19 CBS programs, 6 ABC programs, and 3 nonnetwork shows, according to the ARB survey. The Nielsen Index during approximately the same period included 37 programs of WNCT–TV within the top 40 category, 30 of which were CBS and 7 of which were ABC. Similar data published by ARB and Nielsen with respect to the spring of 1963 show 37 of petitioner's programs in the top 40, composed of 27 CBS, 7 ABC, and 3 nonnetwork according to ARB; and 34 of petitioner's programs in the top 40 under the Nielsen Index, of which 24 were CBS, 7 ABC, and 3 nonnetwork shows. Following the termination of the ABC secondary affiliation, during March of 1964, ARB listed 28 programs broadcast by WNCT–TV among the top 40, consisting of 24 CBS and 4 local programs.

ARB also ranks television markets according to weekly circulation. As of January 1, 1962, the ARB ranking date closest to petitioner's acquisition of WNCT–TV, the Greenville-Washington-New Bern market ranked 92d in size of the 226 markets listed.

In addition to the items already mentioned—network affiliation contracts and advertising contracts—the parties agree that the portion of basis allocable to intangibles is to be divided among the following assets: FCC license, going-concern value, goodwill.

The FCC license is a permit to broadcast without which any broadcast activitiy is prohibited. The existing broadcast license of WNCT–TV was of substantial value to anyone wishing to engage in the business of television broadcasting in the Greenville-Washington-New Bern market since, other than by purchase of an already licensed station, the prospect of acquiring a construction permit and then

license for operation of a station geographically equivalent to WNCT–TV in that market would have been exceedingly doubtful. The value of a license thus depends in part upon the profit potential of a station in the particular market insofar as the market and the station's position in that market affect its profitability. The process of forming a new station in an already developed market is known as "dropping in." The difficulties inherent in this process derive from the rigidity of the table of assignments drawn by the FCC which requires "co-channel" and "adjacent" channel separation of specified sizes.

WNCT–TV was a functioning station at the time of acquisition. As such it employed a sales manager having the creative talent necessary for that position and a sales staff consisting of three individuals. Its general manager, Hartwell Campbell, was a person well versed in the facts of life of the television industry who had been associated with WNCT–TV since its inception. In addition, WNCT–TV had the usual technical crew and news staff necessary to an operating television station and had developed useful associations with advertising representatives. Following acquisition, Park instituted certain innovations in budgeting and advertising matters and caused a few personnel changes to be made, principally the replacement of Campbell, 1½ years after purchase, by a three-man committee.

As stated above, WNCT–TV, as the holder of a primary and secondary affiliation with CBS and ABC, respectively, had a choice of networks from which to secure its programs. A majority of the ABC programs shown by WNCT–TV preempted the CBS programs regularly scheduled for that time. However, a substantial portion (between one third and one half) of the ABC broadcasts did not involve the replacement of a CBS program. The fact that a conflict between the CBS and ABC programs did not arise in those instances was frequently due to the rescheduling of ABC prime time programs to nonprime hours.

WNCT–TV's secondary affilation with ABC was terminated effective September 1, 1963. On this date ABC shifted its affiliation to a then newly constructed station in New Bern bearing the call letters WNBE–TV. The construction permit for this station had been issued in 1955 but due to various difficulties encountered by the holder of this permit, Nathan Frank, construction did not begin until late 1962 or early 1963, and the station was not operational until September 7, 1963. As can be expected in a market having a surplus of networks, the entry of the New Bern station resulted in a realignment of network affiliations in which ABC became the primary affiliate of the new station. Since September 1, 1963, each station has been affiliated with only one network.

Because of the likelihood of change in network affiliations upon

arrival of a third station, two-station markets are commonly referred to as "unstable." In contrast, three-station markets are known as "stable" markets. While changes in affiliations may occur in stable markets the frequency of such changes is considerably less than in unstable markets. Moreover, the loss of a primary affiliation by one of the component stations of a three-station market will ordinarily be offset by acquisition of another since, under normal conditions, each such station is paired off with one network.

Notwithstanding the outstanding construction permit held by Nathan Frank as of the date of petitioner's purchase of WNCT–TV, erection of a station in New Bern seemed particularly unlikely. Certain geographical and economic factors militated against the success of a station located in New Bern, as a result of which Frank met with substantial difficulty in seeking financial backers of his New Bern project. In the first place, New Bern was located in the southeastern section of the television market with a large segment of its sphere of broadcast influence therefore going to waste over uninhabited coastal and sea areas. As a result the number of unduplicated homes a station in New Bern could provide to ABC was relatively small. Thus, a secondary affiliation with WNCT–TV was capable of furnishing ABC a larger audience than could a primary affiliation with a station in New Bern. In this regard, it should be noted that what a network desires is unduplicated coverage, that is, maximum audience contact with minimal duplication. Any such duplication arising from the broadcast coverage overlap of two stations affiliated with the same network is costly to the network since it results in a double charge. In the second place, New Bern lacked the required separation of 180 miles from another station operating on the same frequency. Thus, FCC approval of a station in New Bern was necessarily made contingent upon its consent to broadcast at a reduced level of power, a restriction which also had the effect of diminishing the number of homes reached.

In negotiating the purchase of WNCT–TV Park relied heavily upon its continued possession of a second affiliation. It was his belief, growing out of a recognition of the factors which worked against a New Bern station, that such a station would not begin broadcasting, if at all, for several years following his acquisition; and that even so, WNCT–TV might well have been able to retain its secondary affiliation with ABC. He was fortified in these convictions by the outcome of his discussions with Robert Coe, a representative of ABC, prior to purchase of WNCT–TV. Park's conferences with Coe involved questions of affiliation and were concluded on the note that should a station at New Bern emerge, an event both regarded as unlikely, ABC would nevertheless continue its secondary affiliation with WNCT–TV.

Additional conferences were held during the month of March 1962, shortly before Park took possession, at which ABC urged Park to drop his CBS affiliation and adopt ABC as its primary network. Park declined this offer since CBS was the dominant and most desirable network to have. Contrary to expectation, a station did emerge at New Bern, its feasibility largely brought about by a rather unanticipated change in affiliation which occurred during August 1962. At that time television station WRAL-TV, located in Raleigh, switched its affiliation from NBC to ABC. By thus altering the coverage pattern of ABC in the region, this event paved the way for an ABC affiliation in New Bern. Following this ABC move, the combined audience provided by WRAL-TV in Raleigh and WNBE-TV in New Bern was considered superior to a secondary affiliation with WNCT-TV. Although the change which took place in Raleigh foretold an eventual switch of ABC from WCNT-TV to WNBE-TV, the termination of WNCT-TV's ABC affiliation did not occur until WNBE-TV actually became operational in September 1963.

The effect of ABC's affiliation termination upon WNCT-TV's audience rating is reflected in the following table taken from the ARB and Nielsen surveys:

### ARB

| Survey period | WNCT-TV | | WITN-TV | | WNBE-TV | |
|---|---|---|---|---|---|---|
| | Homes reached | Station share sets in use metro area | Homes reached | Station share sets in use metro area | Homes reached | Station share sets in use metro area |
| 10/29—11/25/61 | 41,700 | 54 | 28,700 | 45 | | |
| 2/16—3/15/62 | 44,600 | 51 | 38,800 | 47 | | |
| 11/7—12/4/62 | 43,800 | 57 | 39,800 | 41 | | |
| 2/15—3/14/63 | 45,400 | 52 | 46,200 | 46 | | |
| 10/27—11/19/63 | 41,400 | 45 | 37,200 | 40 | 6,700 | 12 |
| 3/4—3/31/64 | 41,100 | 44 | 39,900 | 37 | 9,800 | 16 |
| 11/5—11/25/64 | 34,600 | 39 | 37,000 | 39 | 12,400 | 19 |

### NIELSEN

| Survey period | WNCT-TV | | WITN-TV | | WNBE-TV | |
|---|---|---|---|---|---|---|
| | Homes reached | Metro area percent | Homes reached | Metro area percent | Homes reached | Metro area percent |
| 2/26—3/25/62 | 49,800 | 57 | 35,300 | 42 | | |
| 10/15—11/11/62 | 49,100 | 54 | 35,600 | 44 | | |
| 2/25—3/24/62 | 49,600 | 52 | 41,900 | 46 | | |
| 10/21—11/17/63 | 38,600 | 46 | 39,400 | 39 | 7,000 | 13 |
| 2/24—3/22/64 | 39,900 | 48 | 33,200 | 35 | 9,000 | 15 |

From this data it is evident that introduction of a competing station in the Greenville-Washington-New Bern market had a significant impact upon WNCT-TV and WITN-TV, the existing stations in that market.

Petitioner's revenue from CBS and ABC during the period September 1962 through August 1963 was $292,510 and $81,074, respectively, for a total revenue from network advertising of $373,584. During a comparable period following the termination of the ABC affiliation, revenues from CBS, WNCT–TV's then exclusive affiliation, amounted to $330,942, a net reduction of $42,642 from the prior period. After the ABC termination, the void in programing created by this termination was primarily filled by CBS programs where the ABC programs had supplanted CBS programs, and otherwise by films, live shows, and other such nonnetwork productions. Although a reduction of network revenues resulted from the loss of ABC affiliation, some portion of that reduction was offset by earnings from nonnetwork productions. However, because profits from nonnetwork programs are generally below those of network programs, the offset attributable to an increase in nonnetwork income was not complete.

The stipulation of facts shows that during the week of February 15, 1963, petitioner's income from ABC was $1,773.60 with no costs attributable to production of such income. During a comparable period, the week of March 6, 1964, following the termination of the ABC affiliation, network income from replacement programs fell to $681, while nonnetwork programs costs jumped to $516.75. The replacement programs were sometimes CBS productions but often were films and other local productions involving costs of production. In addition to the network revenue, there was income from the sale of advertising both pre- and post-termination of the ABC affiliation. Thus, besides network income of $1,773.60 during the week of February 15, 1963, income from the sale of adjacencies or spots amounted to $1,814.66 for total revenues of $3,588.26. Likewise, for the week of March 6, 1964, additional income from the sale of advertising amounted to $2,920.60 for total revenues in that week of $3,601.60. Revenues for the later period thus exceeded revenues for the earlier period by $13. However, estimated expenses for the March 1964 period were significantly higher due to the necessity of producing the shows and spots which replaced the ABC programs. Total estimated costs in the 1963 period of $170.60 are therefore to be compared with $991.59 for the 1964 period. The estimated decrease in net income as a result of the ABC termination is thus $807.61.

Between 1955 and 1963 the network advertising rates for network programs broadcast by WNCT–TV increased steadily as shown below. Since September 1, 1963, the date of the ABC affiliation termination, WNCT–TV has not received any increases in the class A hourly rate from CBS. Advertising rates of CBS and ABC were increased to the following levels on the dates indicated:

| Date | Class A rate per hour | Date | Class A rate per hour |
|------|------|------|------|
| July 19, 1955 | $250 | May 15, 1960 | $500 |
| Sept. 1, 1955 | 300 | Aug. 15, 1962 | 550 |
| Apr. 1, 1956 | 350 | Feb. 15, 1963 | 600 |
| Mar. 1, 1957 | 450 | | |

On its income tax returns for each of the taxable years in question, petitioner deducted $34,782 amortization on its network affiliation contracts. Respondent disallowed these deductions on the ground that network contracts have an "undeterminable useful life."

#### OPINION

Petitioner acquired television station WNCT–TV in a liquidation qualifying under section 334(b)(2). That section, commonly known as the Kimble-Diamond rule, provides that the basis to the distributee of property acquired in a section 334(b)(2) transaction "shall be the adjusted basis of the stock with respect to which the distribution was made." Under the regulations, the composite basis so determined is to be apportioned among the various assets received in proportion to the fair market values of such assets on the date received. Sec. 1.334–1(c)(4)(viii), Income Tax Regs. By stipulation the portion of the $2,576,168 purchase price (or basis) allocable in this manner to intangible assets is $695,640. As to the further allocation of the latter sum among the various classes of intangibles acquired—which have been identified by stipulation as: Network affiliation contracts, license, advertising contracts, goodwill, and going-concern value— the parties are in dispute. By express reservation, the designation of the above categories in the stipulation is not meant to intimate any specific allocation or indeed whether allocation to any single item shall be greater than zero. It is primarily the proper valuation of the various classes of intangibles, particularly the network affiliations, which underlies the present conflict. Since this issue is significant only in the context of the possible allowance of amortization or loss deductions to petitioner with respect to network affiliation contracts, a matter which is also at issue in the present case, we consider first the availability of such deductions to petitioner.

Petitioner acquired the stock of Carolina, the corporate owner of WNCT–TV prior to liquidation, on March 15, 1962. At that time WNCT–TV held two television network affiliations—a primary affiliation with CBS and a secondary affiliation with ABC. To these contracts petitioner allocated the full basis assigned to intangibles ($695,640). On September 1, 1963, contemporaneously with the entry of a new station at New Bern into the market, ABC terminated its WNCT–TV affiliation in favor of a primary affiliation with the new station.

On its income tax returns for taxable years ending June 30, 1964, and June 30, 1965, the years in question, petitioner computed amortization deductions with respect to network affiliation contracts on the basis of a 20-year useful life. Such deductions were disallowed by respondent on the ground that useful life of network affiliation contracts is not ascertainable with reasonable accuracy.

In its petition before this Court, petitioner modified the theory upon which it relies for allowance of its claimed deductions. Petitioner now asserts that termination of the ABC affiliation during the taxable year ending June 30, 1964, the first of the years before us, gave rise to a loss deduction under section 165.[7] The allowability, as such, of a loss deduction is not challenged by respondent but the amount and proper year of the deduction are disputed. Strange as it may seem, respondent's position is that allowable depreciation of prior years with respect to the ABC contract has consumed the entire basis in such contract leaving little or no remaining basis to support a loss deduction in the year of termination.[8] That the ABC contract is subject to depreciation is not only conceded but vigorously urged by petitioner. The parties part company, however, with regard to the proper useful life of the ABC contract, petitioner computing its amortization allowance thereon for years prior to termination on the basis of a 4-year useful life commencing March 15, 1962, the date of acquisition, and respondent arguing for a maximum useful life of 2 years from the date of purchase. Premised upon the existence of a 2-year life, respondent would have us conclude that the entire basis in the ABC contract was properly allowable as amortization during the years ending June 30, 1962, and June 30, 1963.[9] Since the useful life of the ABC contract is of critical importance in relation to the valuation issue, we reserve discussion thereon for a later point in this opinion. For present purposes we note only that petitioner's estimate of a 4-year useful life for the ABC contract has been adopted by this Court both in computing the amortization allowance for taxable year ending June 30, 1962, and in valuing the network affiliation contracts. As both parties recognize,

---

[7] Petitioner has not abandoned its claim to amortization, however. Petitioner's position, as clarified in its brief, is that it is entitled to a loss deduction in the amount of its basis in the ABC contract adjusted for amortization allowable in prior years. In the petition, the amount of the loss claimed by petitioner is $346,759 (adjusted for depreciation of earlier years). Upon brief, this figure has been reduced by petitioner to $265,640 (similarly adjusted). The right of petitioner to claim amortization with respect to years ending June 30, 1962, and June 30, 1963, has been preserved by an apparently timely filing of a claim for refund. Also, as discussed below, petitioner stands by its contention that the CBS contract is subject to amortization over a useful life of 20 years.

[8] Respondent's contention that the ABC contract was properly subject to amortization is not inconsistent with his position, argued and upheld in *Commissioner v. Indiana Broadcasting Corp.*, 350 F.2d 580 (C.A. 7, 1965), reversing in part 41 T.C. 793 (1964), relating to the indeterminate character of useful life for network contracts. Whatever the result in the case of primary affiliations in a stable market, respondent here concedes that useful life of a secondary affiliation under unstable market conditions is sufficiently determinable to qualify for amortization allowance over its expected life.

[9] With regard to deductions claimed in these years, see fn. 7 *supra.*

facts existing at the close of the taxable year are those to be considered in making a determination of useful life. See sec. 1.167(a)–1(b) and 1.167(b)–0, Income Tax Regs.; *Morganton Full Fashioned Hosiery Co.*, 14 T.C. 695 (1950); *Leonard Refineries, Inc.*, 11 T.C. 1000 (1948); *Commissioner* v. *Mutual Fertilizer Co.*, 159 F.2d 470 (C.A. 5, 1947), reversing 5 T.C. 1122 (1945); *Westinghouse Broadcasting Co.*, 36 T.C. 912 (1961), affd. 309 F.2d 279 (C.A. 3, 1962), certiorari denied 372 U.S. 935 (1963).[10] With respect to taxable year ending June 30, 1963, the parties are in agreement that a revision of useful life is necessary to account for the then imminent termination of the ABC contract, which occurred September 1, 1963.[11]

We thus turn to the primary issue in this case which concerns the proper valuation of the intangible assets. These assets, as already stated, consisted of network affiliation contracts, license, advertising contracts, goodwill, and going-concern value. Of these, the first mentioned is the only asset subject to amortization or loss deductions. Respondent contends that no portion of the basis for intangibles is allocable to network contracts. Petitioner urges, with equal vigor, that a very substantial allocation to the network contracts is called for under the present facts conceding, however, that some allocation to other classes of intangibles, though nominal in most cases, is in order. The answer we believe, as is not uncommon for controversies of this nature, lies somewhere between the extreme positions of the parties.

[10] Sec. 1.167(a)–1(b). *Useful life.* * * * The estimated remaining useful life may be subject to modification by reason of conditions known to exist at the end of the taxable year and shall be redetermined when necessary regardless of the method of computing depreciation. However, estimated remaining useful life shall be redetermined only when the change in the useful life is significant and there is a clear and convincing basis for the redetermination. * * *

In expressing this rule, *Westinghouse Broadcasting Co.*, quoting from *Philadelphia Quartz Co.*, 13 B.T.A. 1146 (1928), stated that "useful life must be based upon the 'facts known or estimates made *at the time a return is filed.*'" (Emphasis added.) A close reading of that case reveals, however, that the Court did not thereby intend to modify the rule contained in the regulations and approved by the courts that facts considered in determining useful life are those "known to exist at the end of the period for which the return is made." See also *Toledo TV Cable Co.*, 55 T.C. 1107, 1117 (1971).

[11] There is no evidence that the actual termination of the ABC contract on Sept. 1, 1963, during the interval between the close of the taxable year ending June 30, 1963, and the filing of a return for such year, Sept. 11, 1963, had a material effect on the estimate of useful life. Useful life for fiscal year ending June 30, 1963, can be appropriately determined in the Rule 50 computation. In this regard petitioner has stated upon brief: "For its second taxable year, ending June 30, 1963, however, petitioner recognizes that, under the *Westinghouse* rule, it would no longer be entitled to any amortization deduction with respect to its ABC contract, and would have to re-estimate the useful life of its CBS contract. By the time petitioner filed its fiscal 1963 return in September of that year, the New Bern station had come on the air and petitioner's ABC contract had been terminated. Thus, at the time petitioner filed its 1963 return, it would have been obvious that the ABC contract no longer had any useful life and that it was thus not a proper subject for an amortization deduction for that year." If, as respondent has interpreted this statement of petitioner, petitioner is thereby contending that no amortization deduction is required for its taxable year ending June 30, 1963, petitioner is clearly in error. Amortization must be taken each year during the life of the asset. The knowledge that an asset will terminate shortly after the close of the taxable year, while it may compel a revision of useful life, does not justify the course suggested by petitioner.

We consider this issue in the perspective of several decided cases involving issues arising in factual circumstances closely resembling those of the instant case, most notably *Meredith Broadcasting Co.* v. *United States*, 405 F.2d 1214 (Ct. Cl. 1968), which deals extensively with the valuation of intangibles in the television industry. The cases of *Indiana Broadcasting Corporation*, 41 T.C. 793 (1964), reversed on the amortization issue only 350 F.2d 580 (C.A. 7, 1965), and *Gulf Television Corp.*, 52 T.C. 1038 (1969), while considering primarily the amortization aspect of network affiliation contracts, discussed *infra*, also have some bearing upon the valuation question by virtue of their close factual similarity to the present case.[12]

It should be noted at the outset that respondent here does not categorize network affiliation contracts as indivisible components of goodwill as he did in both *Indiana* and *Meredith*. Instead, it is his primary contention that WNCT-TV suffered no loss upon termination of the ABC contract because the network affiliations, at least in the present circumstances, possessed no value. This far-reaching assertion is predicated upon two conceded facts—first, that in a three-station market newly constructed stations incur no costs in securing affiliation with one of the three national networks and, second, that in such markets each station will ultimately secure one primary affiliation. It follows, argues respondent, that petitioner paid nothing for affiliation or, stated differently, that the network contracts had no value. As we understand this contention, it is that an individual seeking to acquire a station in a market with two stations or less, such as the Greenville-Washington-New Bern market at the time of petitioner's WNCT-TV purchase, could avoid the substantial cost of affiliation by the simple device of locating and constructing, or, using industry terminology, by "dropping in" a new station in the market. Applying the axiomatic principles stated above, the new station would then, according to respondent, secure affiliation with one of the three networks without cost. Following this line of reasoning, respondent concludes that it is unreasonable to ascribe any portion of the cost of intangibles to the network affiliation.

While there may be some validity to respondent's contention which perhaps calls for an adjustment to the proposed valuation, it does not, by any means, justify the all or nothing result he has urged. Valuation of property as intangible and unique as the assets with which we presently deal does not lend itself to resolution on the basis of so exclusive a reliance upon reason. Petitioner has produced reliable expert testimony that the value of network affiliation is significant whether the market in which a station is located be of a two or three

---

[12] The reversal in *Indiana Broadcasting Corporation* related solely to the amortization issue, leaving intact the conclusion of this Court on the valuation of network affiliations.

station variety. That both buyer and seller of existing stations in practice regard affiliation as a salable commodity of significant value, notwithstanding the possible theoretical alternatives to the purchase of an existing station, is a proposition which cannot be denied on the evidence presented. Indeed, at various points in the testimony of respondent's own witnesses the substantial impact of affiliation upon the purchase price of a station in any market was virtually conceded. Respondent's contention in this regard simply does not accord with the realities of the television industry.

As to the logical force of respondent's argument, we believe that, upon analysis, the axioms of affiliation relied upon to resist the assignment of value to network contracts in a two-station market, pose conceptual difficulties which are more apparent than real. First, it assumes a fact plainly contradicted by the evidence that an individual seeking to operate a station in a given market can open a new station with the same facility as he can acquire an existing station. As the present case well illustrates, practical considerations often exist which make the construction of a new station, however theoretically advantageous it may seem, difficult or impossible. Thus, a prospective purchaser may have no choice but to acquire an operating station. In the Greenville-Washington-New Bern market, in particular, the evidence shows that construction of a third station entailed risks which would have discouraged a prudent investor from embarking upon the course proposed by respondent.[13] Indeed, when approached by Frank and asked to join his New Bern venture prior to acquisition of WNCT-TV, petitioner flatly refused citing reasons of unfeasibility which have been adequately described in our findings. Nor would construction of a new station have provided petitioner with the sought-after benefits of double affiliation. Finally, it is significant that Frank held a construction permit for a new station in New Bern as early as 1955, which, though hardly a viable location at the time, was apparently the best one suited for a third station in the market area. In effect, therefore, the Greenville market area had reached its three station saturation point well before Park's arrival.

To the extent that respondent emphasizes the cost-free aspect of network affiliations in the case of newly constructed stations as reflecting upon their value, or lack thereof, it should be stressed that such a costless acquisition is attributable to the mutuality of benefit which inheres in the television affiliation—a relationship of a clearly symbiotic rather than parasitic nature. Once affiliation is established, however, it assumes a degree of importance among the station's assets

---

[13] As indicated elsewhere in this opinion, construction of a station at New Bern resulted ultimately from a shift in network affiliations by the Raleigh station which occurred after petitioner's acquisition of WNCT-TV.

which is shared by no other single asset. Indeed the very success of the station frequently depends upon affiliation, a fact of life which is well recognized by the industry and FCC alike.[14] There can be no question that it is an asset which has substantial impact upon the earnings of a station and derivatively, in view of the heavy reliance placed upon this factor in valuation of a station, upon the station's purchase price. As such, we conclude that the network affiliations here were highly valuable assets and thus deserve to receive a substantial allocation of the purchase price reserved for intangibles.

We are fortified in our conclusion by the cases, cited above, which have dealt with this issue. Commencing with *Westinghouse Broadcasting Co.*, 36 T.C. 912 (1961), affd. 309 F.2d 279 (C.A. 3, 1962), certiorari denied 372 U.S. 935 (1963), the courts have uniformly treated affiliation contracts as assets of substantial value. See *Indiana Broadcasting Corporation, supra; Gulf Television Corp., supra;* and *Meredith Broadcasting Co.* v. *United States, supra.* In both *Meredith* and *Indiana*, respondent's contention with respect to the value of network affiliations was expressly rejected. While, as respondent correctly states, the issue of valuation is one which depends upon the individual facts of each case, we discern no distinguishing features in those cases, nor have we been provided with any, which justify the radically different result urged in the present case.

Our remaining task is to determine the comparative values of the various intangibles, and in particular, of the network affiliations. Factors which we deem significant to this determination have been set forth in our findings of fact which also reflect, to some degree, the basis of our factual conclusions. Valuation of assets of the type presently under consideration is a process which is hardly susceptible to measurement with mathematical precision. Under the present circumstances "an accurate allocation of value among the several classes of intangibles is impossible, and we must make the broadest kind of estimate." *Meredith Broadcasting Co.* v. *United States, supra* at 1227. We shall, of necessity, confine our present consideration of this issue to those aspects of our determination which merit individual attention.

A proper starting point is the method employed by petitioner's expert, Richard P. Doherty. As stated above, since network affiliation

[14] In an effort to mitigate the plight of unaffiliated stations (often UHF) in markets having two or less regularly affiliated stations, the FCC has recently issued a ruling imposing restrictions upon the access of the affiliated stations to the programs of the "non-affiliated" or third network in the market. FCC 71–322, 28 F.C.C. 2d 169. The purpose of such ruling is to free the programs of the third network—otherwise subject to appropriation by the regularly affiliated stations under a secondary affiliation—for the use of the unaffiliated station. The above ruling closely followed a prior one motivated by similar considerations, which adopted a "prime time access rule" limiting to three per day the number of hours during prime time a station in the top 50 markets (having three or more stations) can broadcast network programs. See FCC 70–466, 23 F.C.C. 2d 382.

contracts are generally transferred in the context of the sale of an operating station, valuation methods which rely upon comparisons of like sales are impossible. Petitioner's expert has therefore found it necessary, and we believe justifiably so, to resort to the capitalization of earnings, a method which he testified is commonly employed in the television industry for such purposes. Respondent's expert, Hyman H. Goldin, offered no alternative valuation method, nor does it appear that he would have been qualified to do so. Although Goldin's credentials in the field of communications are quite impressive, his practical experience in the sale and purchase of television stations is concededly limited. Moreover, by his own admission, Goldin was relatively unfamiliar with the individual facts of the present case, choosing instead to rely upon his general knowledge of the industry which, though helpful, is wanting in evidentiary value. To the extent that the testimony of either witness represented legal conclusions, of course, we do not consider such expert testimony binding, preferring ourselves to assume this juridical function.

Applying his capitalization-of-earnings method, petitioner's expert appraised the value of the combined pair of network affiliation contracts at $948,800. He arrived at this figure by capitalizing WNCT–TV's earnings from network broadcasting over a 4-year period and then reducing it by 25 percent. The 4-year capitalization period chosen for such purpose represents the expected period, in Doherty's estimation, during which WNCT–TV would continue to hold a double affiliation. To reflect the possibility of an earlier than expected entry of a station at New Bern, petitioner's expert reduced the 4-year capitalization figure by 25 percent. Network revenue figures employed in the computation were those of 1961, the year immediately preceding petitioner's acquisition of WNCT–TV. This choice of a base period was justified by Doherty on the ground that it was the closest year to the date of acquisition and, consequently, most accurately reflected the earnings potential of WNCT–TV for years following petitioner's purchase. During the base period, network revenues amounted to $316,197 of which $101,096 or 32 percent was attributable to ABC and $215,101 or 68 percent to CBS. This aggregate figure of $316,197 when multiplied by 4 and then reduced by 25 percent produced the alleged combined valuation figure of approximately $948,800.

The final step of Doherty's valuation process involved the required division of the aggregate figure indicated above between the two affiliation contracts. Starting with an allocation of 32 percent and 68 percent for the ABC and CBS contracts, respectively—the income contribution ratio of each contract to the total network revenue figure—Doherty then increased the relative value of the ABC contract to reflect certain purportedly valuable attributes of such contract

above and beyond its capability of producing network income, arriving at an ultimate allocation of 40 percent and 60 percent, respectively. The factors which, in Doherty's opinion, justified his upward adjustment in the value of the ABC contract were first, that it provided WNCT–TV with ABC programs both to replace less popular CBS programs and to fill time slots which would otherwise have to be filled by locally originated programs, thus increasing spot revenues and decreasing production costs; and second, that it provided petitioner with leverage to secure increases in network time rates from both networks. In round figures petitioner's expert thus allocated $380,000 and $570,000 to the ABC and CBS contracts, respectively.

Respondent has specifically opposed the use of a 4-year useful life for the dual ABC and CBS affiliation in the above computation. The determination of useful life, as already indicated, is significant with respect to the question of both amortization and valuation. Respondent would have us conclude on the basis of the evidence that the expected duration of the combined ABC and CBS contracts was at most 2 years. The effect of such a conclusion upon the amortization allowance has been described *supra*. Its effect upon a valuation of the network contracts is quite clearly to require a reduction in the allocation to such assets generally and, since we have found that the evidence indicated an ABC rather than CBS termination upon entry of a New Bern station to the market, a further reduction in the relative allocation to the ABC as against the CBS affiliation contract.

The evidence herein relating to useful life consists of a statistical analysis of three-station markets. As stated in our findings, the near certainty of at least one network contract termination upon the advent of a new station in the market is not subject to question. On the basis of the statistical data presented, the period of time which may be expected to elapse between entry of the second and third stations in markets approximating the size of the Greenville-Washington-New Bern market was determined to be approximately 8 years. The second station in this market having opened in 1955, a third station could thus have been anticipated to arrive in 1963. Using such industry experience as a starting point, petitioner's expert then considered the impact upon useful life of facts known at the time of acquisition which tended to militate against a timely arrival of a station at New Bern. His judgment in this regard was that such facts could have been expected to prolong the anticipated entry date of the New Bern station by about 2 years or until 1965. In this manner petitioner's expert estimated a useful life for the ABC contract of 4 years from the time of its acquisition. Respondent, accepting the

arithmetical averaging of Doherty but rejecting the balance of his testimony, contends that absolute loyalty to the statistics must be maintained. We are not favorably persuaded by such a selective use of Doherty's testimony. The uncontroverted testimony of petitioner's expert, in our view, was lacking in neither credibility nor reason. Surely, given the facts that construction had not yet begun by the summer of 1962 and that Frank had encountered numerous obstacles in setting up his station, the probability of a new station materializing with the 8-year norm was small. Indeed, Doherty's judgment was confirmed by respondent's own witness, Hartwell Campbell, who, as late as summer 1962, expressed the view that the New Bern station would be long in arriving. It is thus our conclusion, as stated earlier, that a deviation of 2 years from the statistical norm of 8 years, in the present circumstances, was not unreasonable.

While, as already stated, we have accepted the method employed by Doherty in valuing the network contracts, we have not done so without finding it necessary to make substantial adjustment to his computation. Upon careful analysis, we perceive two significant flaws in Doherty's computation. First, such computation is based upon the combined valuation of the ABC and CBS contracts with the stated rationale that petitioner could not have known which of the two contracts would be terminated when the New Bern station became operational. Granted, this fact may not have been known with absolute certainty; however, as we have stated in our findings, the probabilities were strongly in favor of an ABC rather than a CBS termination. The failure of petitioner's expert to consider this factor has had the obvious effect of producing an unduly inflated valuation of the ABC contract. Second, as between the two affiliation contracts, we are not convinced that the use of ABC programs to supplant less popular CBS programs or fill time slots which would otherwise have required independent programing can support the relative increase in its importance over the CBS contract which Doherty has accorded to it. Clearly these advantages describe the value of network affiliation to a television station generally and, as such, are common to both the ABC and CBS affiliations. Finally, to the extent the undervaluation of other intangibles—notably the FCC license and going-concern value—affect the accuracy of Doherty's network contract valuation, the assignment of value to those assets compels a corresponding adjustment to the network contracts. Giving proper recognition to the testimony of petitioner's expert, and on the basis of the record as a whole, we have concluded that the portion of the aggregate basis to be allocated to the ABC network affiliation was $186,000. With respect to the balance of the intangibles, namely the FCC license, the advertising contracts, and the going-concern value, we have

determined their proper allocation to be $75,000.[15] The facts upon which this determination rests have been set forth in detail in our findings of fact. Many of the contentions advanced by the parties have already been considered in *Meredith* at pages 1228–1230, with which case we are in general accord. We add the following to the comprehensive analysis of the valuation issue in *Meredith.*

*License.*—Petitioner has contended that the value of a license must be limited to its cost of acquisition. Any greater allocation, in petitioner's view, is necessarily arbitrary since, in contrast with network affiliation contracts, there is no analogous method of determining the effect of a license upon a station's earnings. Respondent has gone to the opposite extreme, taking the position that a very substantial, if not complete, allocation to the license is in order. There can be little doubt that a substantial allocation to the license is due for, as stated by the court in *Meredith* at page 1228:

[An FCC license] is essential to the legal conduct of their business and without it their business would cease. The value of a broadcast station without an FCC license would not exceed the salvage value of its physical assets. * * *

We do not think the lack of an effective method of valuation can deter the assignment of value to so significant an asset. Nor is there anything in the record to suggest that the seller of an operating station may not lawfully realize a profit on the sale of a license, as petitioner asserts. The testimony in this and other cases to which petitioner adverts in support of such a proposition, merely relates to restrictions upon the independent sale of television licenses. Neither do we feel compelled to ascribe the entire amount allocated to intangibles to the FCC license, as respondent maintains. The value of a license depends upon a variety of factors, as stated in our findings, including the competitive strength of a station in the market and a prospective purchaser's ability to otherwise secure an FCC license in the market. Admittedly a license is a prerequisite to broadcasting without which no profits can be realized. But it must also be borne in mind that the mere possession of a license does not guarantee the realization of profit. Thus, while the FCC license merits a higher allocation than petitioner has consented to, it certainly does not warrant the proportionately high allocation urged by respondent.

*Goodwill, Going-Concern Value, and Advertising Contracts.*—For the purposes of the instant case, no clear division between these categories of intangibles need be drawn since all three uniformly fail to qualify for amortization or loss deductions. Respondent quite nat-

---

[15] In arriving at these figures we have weighed all elements entitled to consideration and have, by way of as close an approximation as reasonably possible, translated them into dollars and cents. *Cohan* v. *Commissioner,* 39 F.2d 540 (C.A. 2, 1930) ; *Bodoglau* v. *Commissioner,* 230 F.2d 336 (C.A. 7, 1956), affirming sub. nom. *Michael Potson,* 22 T.C. 912 (1954).

urally has sought to accord greater significance to these assets than has petitioner, who, conceding some apportionment to going-concern value, if only nominal, has made no allocation at all to the other two items. The evidence tends to bear out petitioner's contention with regard to goodwill. We agree that there is little, if any, goodwill between station and audience since, as has been demonstrated, viewers are concerned with the quality of programs rather than with the particular call letters or management of a station. There is little doubt, however, that an established relationship between advertisers and station is of value to a station. Whether this is characterized as goodwill or as one of the other intangibles not subject to a deduction—such as advertising contracts or going-concern value—is unimportant. For present purposes, therefore, we have aggregated the values of the above three classes of intangibles, raising this composite valuation figure in accordance with our conclusion as to the value of the station-advertiser relationship.

With regard to advertising contracts, petitioner, as indicated above, has ascribed no value to this asset on the theory, well founded in the evidence, that advertising contracts are in practice terminable at will by the advertiser and depend exclusively upon audience ratings. Respondent has once again taken the extreme position, wholly unwarranted in the record, that advertising contracts are to be given face value. While the sum of $316,197, representing the potential revenue from advertising contracts in existence at the time of purchase, may very well have been realized in full by WNCT–TV following such acquisition, we think respondent has exaggerated the importance of advertising contracts to a television station. The fact is that such contracts do not determine the earnings potential of a station, or for that matter guarantee its profitability; advertising is a source not a producer of income. Rather, it is the capacity of a station to attract audiences, and thereby advertisers, which determines its profitability. Certainly, had there been no advertising contracts on its books at the time of acquisition, WNCT–TV would have had little difficulty securing the degree of advertising patronage commensurate with its viewer popularity. Conversely, because advertising contracts are subject to unrestricted cancellation at the advertiser's end, such contracts would have been incapable of averting wide-scale cancellation of advertising commitments or a reduction of rates had the popularity of the station failed to meet expectations. For the above-stated reasons, except to the extent petitioner realized savings in the costs of reproducing such contracts by succeeding to the contracts on the books of WNCT–TV at the time of purchase, we have accorded little importance to such assets in our valuation. As noted above, insofar as the relationship between adverstising personnel and a station is of value

to the television station, it has been included in our appraisal of other intangibles.

Petitioner has conceded that some value is attributable to going concern. However, it has sought to minimize the importance of this asset by adducing testimony of Park to the effect that necessary alterations in the personnel and operating structure of the business detracted from its value to petitioner. We have considered all the evidence in the record and have given appropriate weight to this factor in our determination.

In addition to the claimed amortization and loss deductions discussed above, petitioner has claimed amortization with respect to the CBS contract, relying upon the decision of this Court in *Indiana Broadcasting Corp.*, *supra*. That case held that network affiliation contracts were assets properly subject to amortization and allowed a deduction with respect thereto based upon a useful life of 20 years. Such a conclusion was founded upon an application of the Poisson Exponential Theory of Failure to industrywide statistical data relating to the duration of network affiliation contracts from the start of the television industry to the date of trial. The Seventh Circuit Court of Appeals reversed, finding fault in the application of the Poisson theory to network contract terminations where, as revealed in the stipulated facts, there existed a variable rather than fixed rate of termination. It appears from the evidence, the court indicated, that the remaining life of network contracts tended to increase with age so that network contracts, rather than constituting wasting assets, were in fact assets which expanded in value with the passage of time. Further doubt was cast upon the validity of the statistical analysis presented in *Indiana* by citing, among other things, the state of flux which affected the industry in its early years with its consequent distortion of termination expectation in later years. This unstable condition of the industry was clearly reflected in the statistical data which recorded a full 49 of 88 contract terminations in the 2 years following the freeze period and a far diminished rate of termination as the duration of the contracts increased, only three contracts having been terminated after being in effect 9 years or more. Finally, the court stressed CBS policy—which, all other things being equal, favored retention of existing affiliates against the competing overtures of new stations—as a nonstatistical factor to be considered in determining the probabilities of termination.

Some of the deficiencies in the statistical analysis pointed up by the circuit court were, in fact, acknowledged by this Court in its opinion. They were not, however, considered to be so significant as to destroy the value of the statistical evidence in making a reasonable estimate of useful life since possibilities of termination continued to appear

substantial in the face of rapidly changing economic and technological conditions of the television industry. Nevertheless, the Seventh Circuit's well-reasoned analysis of the evidence has admittedly placed in doubt the validity of the evidence relied upon in *Indiana* and, while we remain committed to the general proposition that proper application of probability theory to statistical evidence may be used to substantiate the eligibility of an asset for depreciation, we are no longer convinced that the particular statistical approach in *Indiana* presented the most reliable interpretation of the statistical data.

Specifically, we believe that proper reliance upon industry data requires a detailed and selective breakdown of the data to show, for example, the relative termination rates of primary and secondary affiliations, the effect of a contract's duration upon its expected life, and the varying probabilities of termination in stable and unstable markets.[16] Such a breakdown in the factual study would reflect the termination probabilities of network affiliation with far more accuracy than the overly general statistical analysis in *Indiana*. If, as it appears, the distorting effect of the relatively high percentage of terminations in the early post-freeze period resulted from the termination of secondary affiliations upon entry of new stations in the markets formerly occupied by fewer than three stations, the elimination of these items might provide a true measure of useful life in stable three-station markets. It may well be that, upon such an analysis, useful life of television network contracts will ultimately be shown to be indeterminate. Lacking additional expert testimony directed to the validity of the Poisson theory in this context or to the other flaws in the statistical analysis highlighted by the Court of Appeals, the record herein does not, in our view, lay an adequate foundation for an effective reappraisal of our conclusion in *Indiana*. Accordingly, we sustain respondent's determination on this issue.

*Decision will be entered under Rule 50.*

---

[16] It is to be noted that the chart constructed by taxpayers' witnesses, appearing on p. 804 of the *Indiana* opinion in this Court, reflects a marked decline in the rate of termination for both the aggregate and selected CBS experience as the years advanced. Thus, a 6.80% rate of termination through 1957 in aggregate experience fell to a low of 5% for the period through 1962. In a like fashion, the rate of termination in selected CBS experience declined from 4.2% to 3.8% during the same period.